VANESSA BUCHKO
BENJAMIN VAUGHN
Enforcement Attorneys
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Buchko): 202-435-9593
Telephone (Vaughn): 202-435-7964
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Benjamin.Vaughn@cfpb.gov

ATTORNEYS FOR PLAINTIFF
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | Case No. _____ |
| v. | **COMPLAINT** |
| Think Finance, LLC, formerly known as Think Finance, Inc., | |
| Defendant. | |

The Consumer Financial Protection Bureau (Bureau) alleges the following

against Defendant Think Finance, LLC, formerly known as Think Finance, Inc.

## INTRODUCTION

1.     Think Finance has overseen, directed, or administered the origination of and collection of loans that are void in whole or in part under state law.

2.     Defendant's participation in the collection of void loans is deceptive, unfair, and abusive.

3.     The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a).

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C § 1345.

5.     Venue is proper in this district because Defendant does business here. 12 U.S.C. § 5564(f).

## PARTIES

6.     The Bureau is an independent agency of the United States Government created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

7.     The Bureau is authorized to initiate federal district court proceedings in its own name and through its own attorneys to address violations of Federal

2

consumer financial law, including violations of the CFPA. 12 U.S.C. § 5564(a)–(b).

8.      Defendant is a privately held company that lists its principal place of business as 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001.

9.      Defendant, according to its website, "provides software technology, analytics, and marketing services to financial clients in the consumer lending industry."

10.     Defendant owns (directly or indirectly) and controls several entities, through which Defendant operates its internet lending business including: Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC Administrative Services, LLC, and TC Decision Sciences, LLC (collectively "the subsidiaries").

11.     The subsidiaries have no assets, bank accounts, locations, activities or employees separate from Defendant. The subsidiaries conduct no business without the involvement and control of Defendant. Defendant is responsible for the subsidiaries' financial obligations, and Defendant is the financial beneficiary of the subsidiaries' operations. Defendant is responsible for performing all of the subsidiaries' contractual obligations, making all their business decisions, and conducting all their operations.

12.     Since 2011, Defendant has extended credit and collected on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

13.     Defendant extends credit and services loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); Defendant is therefore a "covered person" under the CFPA, 12 U.S.C. § 5481(6)(A).

14.     From 2011 through at least 2015, Defendant has performed critical functions for three separate lending businesses owned by Native American Tribes: (1) Great Plains Lending, LLC (Great Plains); (2) MobiLoans, LLC (MobiLoans); and (3) Plain Green, LLC (Plain Green) (collectively, the Tribal lenders). Defendant is therefore a "service provider" under CFPA. 12 U.S.C. § 5481(26).

15.     Great Plains is owned by the Otoe-Missouria Tribe in Oklahoma. Great Plains also offered installment loans from $1,000 to $3,000 with effective annual interest rates of 118% to 448%. Great Plains stopped making loans to new customers on or about the end of 2016, and it stopped extending new loans to prior customers as of March 31, 2017.

16.     MobiLoans is owned by the Tunica Biloxi Tribe in Louisiana. MobiLoans offers a line of credit product with effective annual interest rates of 15% to more than 200%.

17.     Plain Green is owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Montana. Plain Green offers installment loans from $500 to $3,000 with effective annual interest rates of 150% to 375%. Plain Green terminated its relationship with Defendant effective June 1, 2016.

18.     Defendant provided material services to Great Plains and MobiLoans in connection with extending credit and collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

19.     Defendant provided material services to Plain Green, which is located in this District, in connection with extending credit and collecting on the extension of credit in the form of online installment loans to consumers residing throughout the United States.

20.     Defendant substantially assisted Great Plains and MobiLoans in connection with extending credit and collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

21.     Defendant substantially assisted Plain Green, which is located in this District, in connection with extending credit and collecting on the extension of credit in the form of online installment loans to consumers throughout the United States.

22.     Defendant continues to provide material services and substantial assistance to Great Plains and MobiLoans in collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

23.     The Tribal lenders extend credit and service loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collect debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); Great Plains, MobiLoans, and Plain Green are therefore "covered person[s]" under the CFPA, 12 U.S.C. § 5481(6)(A).

24.     Under Defendant's direction and supervision, Capital Management Services L.P. (CMS), Yessio, LLC (Yessio), and others collect on void loans and extensions of credit held by the Tribal lenders.

25.     From at least 2011 through the present, Defendant provided a material service to CMS and Yessio in connection with collecting on the extension of credit

6

in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

26. From at least 2011 through the present, Defendant substantially assisted CMS and Yessio and others in connection with collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

27. CMS, Yessio, and others collect debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), which is a consumer financial product or service covered by the CFPA, 12 U.S.C. § 5481(5)(A); CMS and Yessio are therefore "covered person[s]" under the CFPA, 12 U.S.C. § 5481(6)(A).

## DEFENDANT'S BUSINESS PRACTICES

28. The Tribal lenders began originating and collecting on loans in 2011.

29. Beginning in 2011, the Tribal lenders and Defendant provided high-cost, small-dollar installment loans and lines of credit over the internet to consumers across the United States.

30. From 2011 through the present, Defendant has provided many critical functions for Great Plains and MobiLoans, including marketing, advertising, hosting websites, routing customer calls, training customer service agents to handle customer calls, monitoring Great Plains and MobiLoans employees, providing and maintaining a loan servicing platform, providing and maintaining loan origination

software, identifying third party collection agencies, and facilitating the sale of delinquent accounts.

31.     From 2011 through mid-2016, Defendant provided many critical functions for Plain Green, including marketing, advertising, hosting websites, routing customer calls, training customer service agents to handle customer calls (including in-person training on the Chippewa Cree reservation), monitoring Plain Green employees, providing and maintaining a loan servicing platform, providing and maintaining loan origination software, identifying third party collection agencies, and facilitating the sale of delinquent accounts.

32.     During the periods referenced in Paragraphs 30 and 31, when a loan was funded, the Tribal lenders paid Tailwind Marketing, LLC (a Defendant-owned entity) $100 for marketing services and paid TC Decision Sciences, LLC (a Defendant-owned entity) $150 for use of the underwriting and servicing platform.

33.     Defendant managed the collection activities of CMS and Yessio.

34.     Defendant drafted and administered the contracts between the Tribal lenders and CMS and Yessio.

35.     Defendant drafted call scripts and monitored collection calls made by CMS and Yessio.

36.    Defendant monitored collection rates of CMS and Yessio and managed the transfer of delinquent accounts from the Tribal lenders to CMS and Yessio.

**Defendant Controlled the Tribal Lenders and Ran the Businesses**

37.    As part of the marketing services provided to the Tribal lenders, Defendant analyzed information received/purchased from a credit reporting agency and then, with the permission of the Tribal lenders, sent loan solicitations via U.S. Mail to consumers that matched pre-determined criteria.

38.    Defendant's marketing practices ensured that the same consumer did not receive a solicitation from more than one Tribal lender, thus minimizing or eliminating competition between the Tribal lenders.

39.    After identifying a pool of prospective customers, Defendant decided which Tribal lender's solicitation it would send to individual consumers.

40.    In order to apply for a loan, consumers would visit a website hosted by Defendant and enter a series of personal information including: name, address, phone number, social security number, and bank and employment information.

41.    All loans were originated online, through websites hosted and maintained by Defendant in Texas.

42.    Once a consumer applied for a loan, Defendant's computer system used an algorithm to assign a risk score to the applicant. The Tribal lenders

approved the risk score threshold below which all applicants were rejected and approved the data points used in the algorithm, but Defendant refused to share the algorithm with them.

43.     Other than approving the data points and the threshold for the algorithm, the Tribal lenders did not make decisions on which loans to fund, and which applications to reject.

## Defendant Holds Most of the Financial Risk and Receives Most of the Profit from the Lending Businesses

44.     The Tribal lending businesses were largely funded by GPLS, an investment fund. Although there are other investors in GPLS, Defendant substantially invests in and is responsible for the operations of the fund. One of the Tribal lenders, Plain Green, also obtained funding from at least two other investment sources, and Defendant was responsible for overseeing those investments as well.

45.     The Tribal lenders nominally provided consumers with loan funds, and two days later GPLS generally bought a 90–99% participation interest in the loans, leaving the remaining interest to the Tribal lenders.

46.     GPLS also paid each of the Tribal lenders a service fee of approximately 4% of the gross revenue of the loan portfolios.

47.     Until December 2015, GPLS also reimbursed all of the Tribal lenders' expenses, including employee salaries, vendor fees, and the fees referenced in

Paragraph 32 that Defendant charged for its marketing activities and underwriting and servicing platforms.

48.     GPLS receives an 18% return on its investment, which is guaranteed by Defendant.

49.     After paying the 18% return to GPLS, the Tribal lenders' expenses, and the Tribal lenders' revenue share, Defendant retains the remainder of the revenue from the lending businesses. Since Defendant is a substantial investor in GPLS, Defendant also receives a substantial portion of the return paid to GPLS.

50.     Defendant holds most of the financial risk and receives most of the profit from the lending businesses.

51.     In October 2015, Plain Green terminated its business relationship with Defendant.

## Defendant and the Tribal Lenders Claim that Tribal Law Applies to the Consumer Loan Agreements

52.     At least some of the loan agreements drafted by Defendant for the Tribal lenders contain a choice-of-law provision that declares that the loans are made and accepted on tribal lands, and pursuant to tribal law, regardless of the consumers' home states or relationship to the tribal lands.

53.     For example, a version of MobiLoans's loan agreement included the following language:

11

This Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any State of the United States.

54.     Consumers who accessed the Tribal lenders' websites, applied for credit, and signed loan agreements did so from their states of residence.

55.     The Tribal lenders have no storefronts on tribal lands to originate loans in person; consumers applied for loans over the internet.

56.     None of the Tribal lenders offered loans in the states where their tribal lands were located: MobiLoans did not offer loans in Louisiana, Great Plains did not offer loans in Oklahoma, and Plain Green did not offer loans in Montana.

**Defendant Electronically Credited and Debits Consumers' Bank Accounts**

57.     Defendant, on behalf of the Tribal lenders, uses non-tribally-affiliated banks to transfer funds to and from consumers in the United States, typically through Automated Clearing House (ACH) credit and debit entries.

58.     When consumers were approved for loans, the computer system created by Defendant dispersed funds directly into the consumers' checking accounts, generally through ACH transfers.

59.     When consumer loan accounts became past-due, Defendant generally transferred servicing of the accounts to CMS and Yessio.

60.     When consumer loan accounts became 60-days past-due, Defendant generally sold the loans to a debt collector.

## Defendant Told Consumers that the Loans Were Valid

61.     At numerous points during the loan origination and collection processes, Defendant told consumers, either explicitly or impliedly, that the loans were valid.

62.     Once each loan was disbursed to a consumer, the computer system created by Defendant communicated directly with the consumer via e-mail or letter and told the consumer, either explicitly or impliedly, that payments were due and that the loan was not subject to the consumer's state's laws.

63.     The computer system created by Defendant also collected funds from consumers' accounts and sent consumers automated e-mails reminding them to make payments.

64.     If the computer system collected funds electronically, such as through ACH transfers or credit/debit cards, then the system automatically deposited the funds into accounts controlled by Defendant.

65.     Until the end of 2015, Defendant was responsible for communicating with consumers by sending written responses to consumer complaints, including complaints regarding the legality of the loans.

66.     The written responses to consumer complaints sent by Defendant to consumers suggested or implied that the loans were valid.

## Defendant Knew that the Loans Were Void

67.     Since 2011, despite the loan agreement's claim that state law did not apply to the loans, Defendant has actually maintained lists of states into which the Tribal lenders would not lend. Defendant's underwriting software would automatically deny a loan application for a consumer who lived in a state on one of these "no-state" lists.

68.     Montana was never on the "no-state" list for Great Plains or MobiLoans.

69.     Defendant decided which states would be on the "no-state" lists; the Tribal lenders never told Defendant not to lend in a state.

70.     Defendant told one of the Tribal lenders that Defendant might have liability if state Attorneys General claimed that the loans were illegal.

71.     In 2013, Defendant's then-CEO declared that the Tribal lending model was "extremely vulnerable."

72.     Neither Defendant nor any Tribal lender sued a consumer for failing to pay on a loan. Instead, Defendant generally closed consumers' accounts (without demanding repayment) when consumers complained that the loans violated state law.

73.     In May 2014, Defendant spun off all of its direct lending products to a new company, wholly independent of the Tribal lending products.

## STATE LAWS PROTECTING CONSUMERS
## WHO TAKE OUT SMALL DOLLAR LOANS

74.     Defendant, the Tribal lenders, CMS, and Yessio have originated, serviced, and collected on loans that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render non-compliant loans, such as those offered by Defendant and the Tribal lenders, void *ab initio*.

75.     Defendant, the Tribal lenders, CMS, and Yessio either took these actions directly or used service providers to take these actions on their behalf.

76.     Many states protect consumers from harmful practices associated with the origination, servicing, and collection of certain loans.

77.     Such legal protections include restrictions on the types of entities that may engage in these types of transactions, licensing requirements, and civil and criminal usury limits.

78.     In some states, loans that violate these laws are declared void, meaning that the lender has no legal right to collect, and the borrower is not obligated to pay, some or all of the principal or interest on the loan.

**Interest-Rate Caps**

79.   The following states have enacted laws that render installment loans void if they exceed the usury limit:

a.   Arkansas, whose state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest," Ark. Const. amend. 89, §§ 3, 6(b).

b.   Connecticut, whose state statute voids loans under $5,000 made after July 1, 2016 with interest rates in excess of the "interest that is permitted with respect to the consumer credit extended under the Military Lending Act," Conn. Gen. Stat. Ann. § 36a-558(c)(1), (d)(1) (which is 36%, *see* 10 U.S.C. § 987).

c.   New Hampshire, which prohibits annual interest rates above 36% for loans of $10,000 or less. N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:16(I). Loans that do not comply with those restrictions are void, and the lender has no right to collect any principal, charges, or recompense. N.H. Rev. Stat. § 399-A:23(VIII).

d.   New York, which prohibits any person or corporation not licensed by the state from "directly or indirectly charg[ing], tak[ing] or receiv[ing] any interest . . . at a rate exceeding" annual interest of 16% on covered loans. N.Y. Gen. Oblig. Law § 5-501; N.Y.

Banking Law § 14-a(1). Loans that exceed the rate are void. N.Y.

Gen. Oblig. Law § 5-511; *see also Szerdahelyi v. Harris*, 490

N.E.2d 517, 522–23 (N.Y. 1986) ("[A] usurious transaction is void

*ab initio* . . . .").

e. North Carolina imposes a cap on loans $25,000 and under that is

the greater of 16% or the latest published noncompetitive rate for

U.S. Treasury bills with a six month maturity as of the fifteenth

day of the month plus 6% rounded to the nearest one-half of one

percent. N.C. Gen. Stat. § 24-1.1(a)(1), (c). Loans $15,000 and

under that violate those provisions are void, and the lender has no

right to collect, receive, or retain any principal or charges. N.C.

Gen. Stat. § 53-166(a), (d).

f. Since November 16, 2016, South Dakota, in which loans made by

money lender licensees with an annual percentage rate above 36%

are void and uncollectable; any person evading the usury cap,

including by offering loans through the internet or any electronic

means, is subject to the same penalties as licensees. S.D. Codified

Laws §§ 54-4-44, 54-4-44.1.

80.     Colorado prohibits annual interest above 12% on unpaid balances for

loans other than supervised loans. Colo. Rev. Stat. §§ 5-1-301(12), (15)(a) (47); 5-

2-201(1). For supervised loans, Colorado prohibits a supervised lender from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1000.01 and $3,000, and 15% on unpaid balances greater than $3,000, and (b) 21% per year on unpaid balances. *Id.* § 5-2-201(2). Unless a person has been issued a state license or is a depository institution, it may not make or take assignment of and undertake direct collection of payments from supervised loans. Colo. Rev. Stat. § 5-3-101(1). Consumers are relieved of the obligation to pay any charge that exceeds these limits and are entitled to a refund from the lender or assignee for any excess amount that they paid. *Id.* § 5-5-201(2).

81.    These state usury statutes reflect the strong public policy interest in ensuring that consumers who lack negotiating power are protected from loans with excessive interest rates.

82.    Defendant and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers in Arkansas, Connecticut, New Hampshire, New York, North Carolina, and South Dakota that charged interest at rates exceeding those allowed by the laws of the respective states, and those loans are therefore void.

83.    Defendant and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers in Colorado that charged interest

at rates exceeding those allowed by Colorado law, and consumers were therefore relieved of the obligation to pay charges in excess of the legal limits.

## Licensing Requirements

84.    The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Arizona, Colorado, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

a.  ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); Ind. Code § 24-4.5-3-503(2); 209 Mass. Code Regs. 20.03(2); N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:5(I); N.Y. Banking Law § 342); and

b.  ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as recordkeeping and annual reports (Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-609(A)-(D); Colo. Rev. Stat. §§ 5-2-304, 5-2-305; Ind. Code § 24-4.5-3-505; Mass. Gen. Laws ch. 140,

§§ 97–99; N.H. Rev. Stat. §§ 399-A:10, 399-A:11; N.Y. Banking

Law §§ 348, 349; N.C. Gen. Stat. § 53-184).

85.    These state licensing statutes reflect the strong public policy interest

in ensuring that entities seeking to engage in the consumer-lending business are

vetted and supervised by regulators for compliance with consumer-protection and

other laws.

86.    Many state laws render payday loans void if they are made without a

license. If a covered loan is made without a license in the following states, the

entity has no right to collect from consumers, or the consumers have no obligation

to repay, certain loan amounts:

a.  Arizona, which voids covered loans of $10,000 or less that are

made or procured without a license, and the lender has no right to

collect any principal, finance charges, or other fees in repayment of

such loans, Ariz. Rev. Stat. §§ 6-601(5)–(7), 6-602(B), 6-603(A),

6-613(B);

b.  Connecticut, which, since June 19, 2015, voids loans of $15,000 or

less that charge interest in excess of 12%, when made without a

license, Conn. Gen. Stat. Ann. § 36a-558(c);

c.  Illinois, which voids consumer-installment loans for principal

amounts not exceeding $40,000 made after January 1, 2013,

without a license and at interest rates higher than 99% APR for
loans up to $1,500; the person who made the loan shall have no
right to collect, receive, or retain any principal, interest, or charges
related to the loan, 205 Ill. Comp. Stat. §§ 670/1, 670/17.2(a)(1),
670/20(d);

d. Indiana, which voids covered loans made without a license; the
debtor has no obligation to pay either the principal or finance
charges on such loans, Ind. Code §§ 24-4.5-3-502(3), 24-4.5-5-
202(2);

e. Kentucky, which voids covered loans if the interest rate exceeds
the lawful rate—which is the lesser of 4% over the discount rate on
ninety-day commercial paper at the Federal Reserve Bank or 19%
for loans of $15,000 or less—and the loan is made without a
license; the lender has no right to collect any principal, charges, or
recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§
286.4-420, 286.4-991(1), 360.010(1);

f. Massachusetts, which voids covered loans of $6,000 or less if
interest and expenses on the loan exceed 12% and the loan is made
or purchased without a license; the lender or purchaser has no right

21

to collect money in repayment of such loans, Mass. Gen. Laws Ch. 140, §§ 96, 110;

g.  Minnesota, which voids regulated loans made without a required license and requires lenders of up to $100,000 to hold a license in order to issue loans with interest in excess of 21.75% APR, or the total of 33% on the part of the unpaid balance up to $1,125 and 19% a year on the part of the unpaid balance above $1,125, Minn. Stat. Ann. §§ 47.59 subdiv. 3(a), 56.01(a), 56.19, 56.131;

h.  Montana, which requires lenders making consumer loans to hold a license; loans made or collected by anyone other than a licensee or entity subject to an exemption are void, Mont. Code Ann. § 32-5-103(1), (4);

i.  New Hampshire, which voids covered loans of $10,000 or less that are made without a license; the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:2(I), 399-A:23 (VII);

j.  New Jersey, which voids consumer loans of $50,000 or less that are made without a license; the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the

act was the result of good-faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

k. New Mexico, which voids loans of $2,500 or less made by a person with no license; the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3;

l. New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee; the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

m. North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license and in excess of the state's general usury law; any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d); and

n. Ohio, which voids loans of $5,000 or less that are made without a license; the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02.

87.     Colorado relieves the consumer's obligation to pay finance charges to the lender or assignee where the lender or assignee has failed to obtain the requisite license. Colo. Rev. Stat. §§ 5-1-301(17), 5-2-301(1)(a)–(b), 5-5-201(1).

88.     Neither Defendant nor any Tribal lender was licensed to make loans in any of these states.

89.     Defendant and Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers residing in Arizona, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio, and those loans are void because of Defendant's and the Tribal lenders' failure to acquire the required licenses.

90.     Defendant and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers residing in Colorado, and those consumers were relieved of the obligation to repay finance charges because of Defendant's and the Tribal lenders' failure to acquire the required licenses.

### Summary of States in Which
### Defendant's and the Tribal Lenders' Loans Are Void in Whole or in Part

91.     Loans originated by Defendant and the Tribal lenders were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota,

Montana, New Hampshire, New Mexico, New York, North Carolina, Ohio, and South Dakota.

92. Colorado relieves consumers of the obligation to repay excess fees and finance charges for loans that exceed interest rates limits or are issued without a license.

93. The states listed in Paragraphs 91 and 92 are hereinafter referred to as the "Subject States."

94. Either directly or through service providers, Defendant, the Tribal lenders, CMS, and Yessio collected on loans made to consumers in the Subject States that those states' laws voided or limited a consumer's obligation to repay.

95. From November 1, 2013 through June 1, 2015, Defendant lent at least $35.2 million to consumers in the Subject States through loans ostensibly offered by Great Plains and Plain Green. During the same time period, Defendant collected at least $31.7 million in principal and $25.5 million in interest and fees on those loans.

96. From November 1, 2013 through July 26, 2017, Defendant lent at least $13.9 million to consumers in the Subject States through lines of credit ostensibly offered by MobiLoans. During the same time period, Defendant collected at least $13.9 million in principal and collected at least $14.7 million in interest and fees on those lines of credit.

## VIOLATIONS OF THE CONSUMER
## FINANCIAL PROTECTION ACT

### Unfair, Deceptive, and Abusive Acts or Practices

97.     Sections 1031 and 1036 of the CFPA prohibit a "covered person" or "service provider" from engaging in "any unfair, deceptive or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

98.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

99.     An act or practice is abusive if, among other things, it takes unreasonable advantage of a consumer's lack of understanding of the material risks, costs, or conditions of the product or service. 12 U.S.C. § 5531(d)(2)(A).

### Count I

*Deception Relating to the Collection of Loan Payments*
*that Consumers Did Not Owe*

100.   The Bureau realleges and incorporates by reference Paragraphs 1–99 of this Complaint.

101.   Through the actions set forth above, Defendant and the Tribal lenders represented expressly or impliedly that consumers residing in the Subject States had an obligation to repay loan amounts that in fact did not exist, in whole or in

part, because the loans violated state licensing or usury laws that declared such loans or loan amounts void *ab initio*.

102.    Through the following actions, Defendant, the Tribal lenders, CMS, and Yessio reinforced the misrepresentations that consumers were obligated to pay debts that were void, in whole or in part, in the Subject States:

      a.   Sending demand letters for payment;

      b.   Originating ACH debit entries from consumer bank accounts; and

      c.   Contacting consumers by telephone to demand repayment.

103.    In numerous instances, consumers residing in Subject States were not under a legal obligation to repay the void amounts.

104.    Defendant, the Tribal lenders, CMS, and Yessio failed to disclose that they had no legal right to collect certain loan payments because the loans were void, in whole or in part, under state law.

105.    Defendant, the Tribal lenders, CMS, and Yessio failed to disclose that consumers had no legal obligation to pay the loan amounts because they were void, in whole or in part, under state law.

106.    The misrepresentations in Paragraphs 101, 102, 104, and 105 were material and likely to mislead consumers acting reasonably.

107.    The misrepresentations, actions, and omissions of Defendant constitute deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

108.   The misrepresentations, actions, and omissions of the Tribal lenders, CMS, and Yessio constitute deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count II

### Unfairness Relating to the Collection of Loan Payments that Consumers Did Not Owe

109.   The Bureau realleges and incorporates by reference Paragraphs 1–99 of this Complaint.

110.   Defendant, the Tribal lenders, CMS, and Yessio caused substantial injury by servicing, extracting payments for, and collecting on loans that laws in the Subject States rendered void or limited consumers' obligation to repay.

111.   Consumers were unlikely to know that that Subject States' usury laws or licensing requirements rendered the loans void or limited consumers' obligation to repay, and thus consumers were unable to avoid paying illegal amounts to which Defendant, the Tribal lenders, CMS, and Yessio were not entitled.

112.   The injuries sustained by consumers residing in the Subject States were not outweighed by countervailing benefits to consumers or to competition.

113.   The actions of Defendant constitute unfair acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

114.   The actions of the Tribal lenders, CMS, and Yessio constitute unfair acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count III

*Abusiveness Relating to the Collection of Loan Payments
that Consumers Did Not Owe*

115.    The Bureau realleges and incorporates by reference Paragraphs 1–99 of this Complaint.

116.    The consumer's legal obligation to repay is a material risk, cost, or condition of a loan.

117.    Consumers residing in the Subject States likely were unaware that Defendant, the Tribal lenders, CMS, and Yessio lacked the legal authority to collect the loans, in whole or in part, because the loans violated usury or licensing laws in those states.

118.    Defendant, the Tribal lenders, CMS, and Yessio took unreasonable advantage of consumers' lack of understanding regarding the voidness of the loans by collecting amounts to which Defendant, the Tribal lenders, CMS, and Yessio were not legally entitled, in whole or in part.

119.    The actions of Defendant constitute abusive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

120.    The actions of the Tribal lenders, CMS, and Yessio constitute abusive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count IV

*Substantially Assisting the Tribal Lenders, CMS, and Yessio*

121.   The Bureau realleges and incorporates by reference Paragraphs 1–99 of this Complaint.

122.   The Tribal lenders, CMS, and Yessio described in Paragraphs 14–27 are "covered person[s]" engaged "in offering or providing a consumer financial product or service" because they extend, service, and collect on consumer loans. 12 U.S.C. § 5481(5), (6), (15)(A)(i), (15)(A)(x).

123.   The Tribal lenders, CMS, and Yessio committed deceptive, unfair, and abusive acts or practices by demanding payment for and collecting debts that were void or that consumers were not required to repay.

124.   These deceptive, unfair, and abusive acts or practices violated 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

125.   Defendant provided substantial assistance to the Tribal lenders, CMS, and Yessio in the commission of these deceptive, unfair, and abusive acts by overseeing, directing, or administering the origination of and collection of loan amounts that were void, in whole or in part.

126.   Defendant acted knowingly or recklessly in providing this substantial assistance.

127.   Defendant's actions constituted violations of section 1036(a)(3) of the CFPA, 12 U.S.C. §5536(a)(3).

## **PRAYER FOR RELIEF**

128.   Wherefore, the Bureau, pursuant to sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

    a.  Permanently enjoin Defendant from committing future violations of the CFPA or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

    b.  Grant additional injunctive relief as the Court may deem to be just and proper;

    c.  Award damages and other monetary relief against Defendant as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the CFPA, including but not limited to restitution and the refund of monies paid;

    d.  Order disgorgement of Defendant's ill-gotten gains;

    e.  Award civil money penalties;

    f.  Award the costs of bringing this action; and

    g.  Award additional relief as the Court may determine to be just and proper.

Dated: November 15, 2017          Respectfully submitted,

                                  Kristen A. Donoghue
                                  *Enforcement Director*

                                  Deborah Morris
                                  *Deputy Enforcement Director*

                                  Craig Cowie
                                  *Assistant Litigation Deputy*

                                  /s/ Vanessa Buchko
                                  Vanessa Buchko
                                  Benjamin Vaughn
                                  *Enforcement Attorneys*
                                  Consumer Financial Protection Bureau
                                  1700 G Street, NW
                                  Washington, DC 20552
                                  Telephone (Buchko): 202-435-9593
                                  Telephone (Vaughn): 202-435-7964
                                  Fax: 202-435-7722
                                  E-mail: Vanessa.Buchko@cfpb.gov
                                  E-mail: Benjamin.Vaughn@cfpb.gov
                                  *Attorneys for Consumer Financial*
                                          *Protection Bureau*