VANESSA BUCHKO
BENJAMIN VAUGHN
ADRIENNE WARRELL
Enforcement Attorneys
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Buchko): 202-435-9593
Telephone (Vaughn): 202-435-7964
Telephone (Warrell): 202-435-7013
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Benjamin.Vaughn@cfpb.gov
E-mail: Adrienne.Warrell@cfpb.gov

ATTORNEYS FOR PLAINTIFF
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, <br><br> Plaintiff, <br><br> v. <br><br> Think Finance, LLC, formerly known as Think Finance, Inc., Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC Administrative Services, LLC, and TC Decision Sciences, LLC, <br><br> Defendants. | Case No. 4:17-cv-00127-BMM <br><br> **FIRST AMENDED COMPLAINT** |

1

The Consumer Financial Protection Bureau (Bureau) alleges the following against Defendants. Think Finance, LLC managed and directed an internet lending business that affiliated with lenders owned by Native American Tribes. Think Finance, LLC operated its business through a common enterprise of subsidiaries which Think Finance, LLC wholly owns and controls: Think Finance, SPV, LLC (the legal entity that invested in the operation), Financial U, LLC (the legal entity that provided educational services to consumers), TC Loan Service, LLC (the legal entity that employed all of the enterprise's employees), Tailwind Marketing, LLC (the legal entity that provided marketing services for the enterprise), TC Administrative Services, LLC (the legal entity that directed and administered investments in the enterprise), and TC Decision Sciences, LLC (the legal entity that provided the technology services to the enterprise to originate and service loans) (all Defendants collectively "Think Finance" or "Defendants").

## INTRODUCTION

1.     Think Finance has overseen, directed, or administered the origination of and collection of loans that are void in whole or in part under state law.

2.     Think Finance's participation in the collection of void loans is deceptive, unfair, and abusive.

3.     The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a).

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

5.     Venue is proper in this district because Think Finance does business here. 12 U.S.C. § 5564(f).

## PARTIES

6.     The Bureau is an independent agency of the United States Government created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

7.     The Bureau is authorized to initiate federal district court proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including violations of the CFPA. 12 U.S.C. § 5564(a)–(b).

8.     Think Finance, LLC is a privately held company that lists its principal place of business as 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001.

9.     Think Finance, LLC according to its website, "provides software technology, analytics, and marketing services to financial clients in the consumer lending industry."

3

10.    From 2011 through at least 2016, Think Finance has performed material functions for three separate lending businesses owned by Native American Tribes: (1) Great Plains Lending, LLC (Great Plains); (2) MobiLoans, LLC (MobiLoans); and (3) Plain Green, LLC (Plain Green) (collectively, the Tribal lenders).

11.    Since 2011, Think Finance has extended credit and collected on the extension of credit in the form of online installment loans and online lines of credit (ostensibly originated by the Tribal lenders) to consumers residing in this District and throughout the United States.

12.    Think Finance, LLC extends credit and services loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); Think Finance, LLC is therefore a "covered person" under the CFPA, 12 U.S.C. § 5481(6)(A).

13.    Think Finance, LLC owns and controls several entities, through which it operates its internet lending business, including Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC

Administrative Services, LLC, and TC Decision Sciences, LLC, (collectively "the Subsidiaries"). Each of the Subsidiaries is a Delaware limited liability company.

14.     Think Finance, LLC and the Subsidiaries operate as an enterprise, as discussed in detail below, to conduct the lending operations. Think Finance used these Subsidiaries to handle financing, marketing, origination, and underwriting, among other functions.

15.     Think Finance SPV, LLC ("Think SPV") is wholly owned by Think Finance, LLC. It does not have its own office or infrastructure. Think SPV's primary purposes were to invest and hold shares in GPL Servicing, Ltd. ("GPLS"), the investment fund that financed the Tribal lenders. Although there are other investors in GPLS, Think Finance, through Think SPV, substantially invests in the operations of GPLS.

16.     Because Think SPV is wholly owned by Think Finance, LLC and performed material functions in the operation and maintenance of Think Finance's online lending business, Think SPV is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

17.     Financial U, LLC ("Financial U") is wholly owned by Think Finance, LLC and provided financial education services for the Tribal lenders, including an online learning center to ostensibly help consumers understand the loan process.

18.     Because Financial U is wholly owned by Think Finance, LLC and performed material functions in the operation and maintenance of Think Finance's online lending business, it is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

19.     TC Loan Service, LLC ("TC Loan Service") is wholly owned by Think Finance, LLC. Its sole purpose was to serve as the contractual party for Think Finance's vendors and as the formal legal employer of Think Finance's employees.

20.     Because TC Loan Service is wholly owned by Think Finance, LLC and performed material functions in the operation and maintenance of Think Finance's online lending business, TC Loan Service is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

21.     Tailwind Marketing, LLC ("Tailwind Marketing") is wholly owned by TC Loan Service. Tailwind Marketing does not have its own office, infrastructure, or employees. It was used by Think Finance to provide marketing services to the Tribal lenders. Specifically, Tailwind Marketing was the legal entity responsible for designing websites, providing website administrative or operational assistance, providing leads, marketing consumer loans, and coordinating paid

online advertising and search engine optimization. The Tribal lenders paid a fee to Tailwind Marketing for each funded loan. Those fees were then reimbursed by GPLS.

22.    Because Tailwind Marketing is wholly owned by a Think Finance subsidiary and performed material functions for Think Finance in connection with the operation and maintenance of Think Finance's online lending business, Tailwind Marketing is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

23.    TC Administrative Services, LLC ("TC Administrative Services") is wholly owned by TC Loan Service. TC Administrative Services does not have its own employees or its own office. Think Finance used TC Administrative Services to assist with originating consumer loans and with bookkeeping. Specifically, TC Administrative Services provides or provided accounting services and financial settlement services to GPLS and helped GPLS administer its investment in the Tribal lenders. TC Administrative Services also buys back from GPLS any interest in loans that have failed. GPLS pays or paid fees to TC Administrative Services for these administrative services.

24.     TC Administrative Services was also responsible for overseeing investments into one of the Tribal lenders, Plain Green, from at least two other sources.

25.     Because TC Administrative Services is wholly owned by a Think Finance subsidiary and performed material functions in the operation and maintenance of Think Finance's online lending business, TC Administrative Services is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

26.     TC Decision Sciences, LLC ("TC Decision Sciences") is wholly owned by TC Loan Service. TC Decision Sciences does not have its own employees or its own offices. Its sole purpose was to serve as the contracting party with the Tribal lenders for the underwriting and technology services provided by Think Finance. The Tribal lenders paid a fee to TC Decision Sciences for each funded loan. Those fees were then reimbursed by GPLS.

27.     Because TC Decision Sciences is wholly owned by a Think Finance subsidiary and performed material functions in the operation and maintenance of Think Finance's online lending business, TC Decision Science is an "affiliate" of and "service provider" to Think Finance, LLC and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26).

28.     Great Plains is owned by the Otoe-Missouria Tribe in Oklahoma.
Great Plains offered installment loans from $100 to $3,000 with effective annual
interest rates of 179% to 450%. Great Plains stopped making loans to new
customers on or about the end of 2016, and it stopped extending new loans to prior
customers as of March 31, 2017.

29.     MobiLoans is owned by the Tunica Biloxi Tribe in Louisiana.
MobiLoans offers a line of credit product with effective annual interest rates of
15% to more than 200%.

30.     Plain Green is owned by the Chippewa Cree Tribe of the Rocky Boy's
Indian Reservation in Montana. Plain Green offers installment loans from $250 to
$3,000 with effective annual interest rates of 120% to 375%. Plain Green
terminated its relationship with Think Finance effective June 1, 2016.

31.     Think Finance provided material services to Great Plains and
MobiLoans in connection with extending credit and collecting on the extension of
credit in the form of online installment loans and online lines of credit to
consumers residing in this District and throughout the United States.

32.     Think Finance provided material services to Plain Green, which is
located in this District, in connection with extending credit and collecting on the
extension of credit in the form of online installment loans to consumers residing
throughout the United States.

33.     Think Finance substantially assisted Great Plains and MobiLoans in connection with extending credit and collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

34.     Think Finance substantially assisted Plain Green, which is located in this District, in connection with extending credit and collecting on the extension of credit in the form of online installment loans to consumers throughout the United States.

35.     Think Finance continues to provide material services and substantial assistance to Great Plains and MobiLoans in collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

36.     The Tribal lenders extend credit and service loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collect debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); Great Plains, MobiLoans, and Plain Green are therefore "covered person[s]" under the CFPA, 12 U.S.C. § 5481(6)(A).

37.     Because Think Finance has performed material functions for the

Tribal lenders, including directing, controlling, maintaining, and otherwise participating in the Tribal lenders' online lending operations, Think Finance is a "service provider" to Great Plains, MobiLoans, and Plain Green under the CFPA. 12 U.S.C. § 5481(26).

38.     Capital Management Services L.P. (CMS) is a privately held company that lists its address as Buffalo, New York.

39.     Yessio, LLC (Yessio) is a privately held company that lists its address as Taylorsville, Utah.

40.     Think Finance transferred some collection responsibility to CMS, Yessio, or others to collect on void loans and extensions of credit held by the Tribal lenders, once the accounts were delinquent. Think Finance oversaw and directed their collection activity. The contract between TC Administrative Services and MobiLoans provides:

> TCAS shall perform the following services. . . for MobiLoans: Oversight and management of outsourced vendors including, but limited to, vendors providing data, verification, collections and customer support services ("Outsourced Vendors"), which shall include the right to (i) participate in the negotiation of the respective services agreements with such outsourced vendors (collectively, "Outsourced Services Agreements") and (ii) terminate any agreement between MobiLoans and such outsourced vendor . . .

41.     From at least 2011 through the present, Think Finance provided a material service to CMS and Yessio in connection with collecting on the extension

of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

42.     From at least 2011 through the present, Think Finance substantially assisted CMS and Yessio and others in connection with collecting on the extension of credit in the form of online installment loans and online lines of credit to consumers residing in this District and throughout the United States.

43.     CMS and Yessio collect debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), which is a consumer financial product or service covered by the CFPA, 12 U.S.C. § 5481(5)(A); CMS and Yessio are therefore "covered person[s]" under the CFPA, 12 U.S.C. § 5481(6)(A).

44.     Because Think Finance has performed material functions for CMS and Yessio, Think Finance is a "service provider" to CMS and Yessio under the CFPA. 12 U.S.C. § 5481(26).

## COMMON ENTERPRISE

45.     Defendant Think Finance, LLC—through Defendants Think SPV, Financial U, TC Loan Service, Tailwind Marketing, TC Administrative Services, and TC Decision Sciences—operated as a common enterprise while engaging in the unfair, deceptive, and abusive acts and practices and other violations of law described below.



46.   Think Finance, LLC has conducted its business practices through an interrelated network of companies that have common ownership, management, business functions, addresses, office space and employees.

47.   The management structure of Think Finance, LLC including its Chief Executive Officer and Chief Financial Officer, controls and manages Think Finance, LLC and each of the Subsidiaries.

48.   The Subsidiaries conduct no business without the involvement and control of Think Finance, LLC. Think Finance, LLC is responsible for the Subsidiaries' financial obligations, and Think Finance, LLC is the financial beneficiary of the Subsidiaries' operations. Think Finance, LLC is responsible for performing all of the Subsidiaries' contractual obligations, making all their business decisions, and conducting all their operations.

49.     Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## DEFENDANTS' BUSINESS PRACTICES

50.     Think Finance is a consumer lending operation that affiliates with the Tribal lenders. Defendants are responsible for all of the critical functions of the lending operation, hold most of the risk, and reap most of the profits.

51.     Think Finance began partnering with the Tribal lenders to originate and collect on loans in 2011.

52.     Beginning in 2011, the Tribal lenders and Think Finance provided high-cost, small-dollar installment loans and lines of credit over the internet to consumers across the United States.

53.     From 2011 through the present, Think Finance has provided many material, critical functions for Great Plains and MobiLoans, including marketing, advertising, hosting websites, routing customer calls, training customer service agents to handle customer calls, monitoring Great Plains and MobiLoans employees, providing, maintaining, and operating a loan servicing platform to service customer accounts, providing, maintaining, and operating a loan origination platform to originate loans, collecting on loans that were not past-due, identifying third party collection agencies, and facilitating the sale of delinquent accounts.

54.     From 2011 through mid-2016, Think Finance provided many material, critical functions for Plain Green, including marketing, advertising, hosting websites, routing customer calls, training customer service agents to handle customer calls (including in-person training on tribal lands), monitoring Plain Green employees, providing, maintaining, and operating a loan servicing platform to service customer accounts, providing, maintaining, and operating a loan origination platform to originate loans, collecting on loans that were not past-due, identifying third party collection agencies, and facilitating the sale of delinquent accounts.

55.     From 2011 through the present, when a loan was funded, Great Plains and MobiLoans paid Tailwind Marketing a fixed fee for marketing services and paid TC Decision Sciences a fixed fee for use of the underwriting and servicing platform.

56.     From 2011 through mid-2016, when a loan was funded, Plain Green paid Tailwind Marketing a fixed fee for marketing services and paid TC Decision Sciences a fixed fee for use of the underwriting and servicing platform.

57.     Think Finance collected on void loans unless the accounts became delinquent. Once the accounts were delinquent, Think Finance transferred some collection responsibility to CMS and Yessio.

58.     Think Finance initiated the business relationships between the Tribal lenders and CMS and between the Tribal lenders and Yessio. In 2015, Plain Green began collecting delinquent loans separately from CMS and Yessio.

59.     Think Finance managed the collection activities of CMS and Yessio.

60.     Think Finance drafted and administered the contracts between the Tribal lenders and CMS and between the Tribal lenders and Yessio.

61.     Think Finance drafted and edited call scripts and monitored collection calls made by CMS and Yessio.

62.     Think Finance managed the transfer of delinquent accounts from the Tribal lenders to CMS and Yessio and monitored collection rates of CMS and Yessio.

**Think Finance Controlled the Tribal Lenders and Ran the Businesses**

63.     As part of the marketing services provided to the Tribal lenders, Think Finance analyzed information received or purchased from a credit reporting agency, and then, with the permission of the Tribal lenders, sent loan solicitations via U.S. Mail to consumers that matched pre-determined criteria.

64.     Think Finance determined the frequency and scope of direct mail marketing campaigns—the primary source of the Tribal lenders' business.

65.     Think Finance's marketing practices ensured that the same consumer did not receive a solicitation from more than one Tribal lender, thus minimizing or eliminating competition between the Tribal lenders.

66.     After identifying a pool of prospective customers, Think Finance decided which Tribal lender's solicitation it would send to individual consumers.

67.     In order to apply for a loan, consumers would visit a website hosted by Think Finance and enter a series of personal information including: name, address, phone number, social security number, and bank and employment information.

68.     All loans were originated online, through websites hosted and maintained by Think Finance in Texas.

69.     Once a consumer applied for a loan, Think Finance's computer system used an algorithm to assign a risk score to the applicant. The Tribal lenders approved the risk score threshold below which all applicants were rejected and approved the data points used in the algorithm, but Think Finance refused to share the algorithm with the Tribal lenders.

70.     Other than approving the data points and the threshold for the algorithm, the Tribal lenders did not make decisions on which loans to fund, and which applications to reject.

### Think Finance Holds Most of the Financial Risk and
### Receives Most of the Profit from the Lending Businesses

71.    The Tribal lending businesses were largely funded by GPLS, an investment fund. Although there are other investors in GPLS, Think Finance substantially invests in and is responsible for the operations of the fund. One of the Tribal lenders, Plain Green, also obtained funding from at least two other investment sources, and Think Finance was responsible for overseeing those investments as well.

72.    The Tribal lenders nominally provided consumers with loan funds, and two days later GPLS generally bought a 90–99% participation interest in the loans, leaving the remaining interest to the Tribal lenders.

73.    If for any reason GPLS did not purchase the full participation interest to which it was contractually entitled from MobiLoans, Think Finance was required by contract with MobiLoans to purchase the remaining participation interest in the loan.

74.    GPLS also paid each of the Tribal lenders a service fee of approximately 4% of the gross revenue of the loan portfolios.

75.    Until December 2015, GPLS also reimbursed all of the Tribal lenders' expenses, including employee salaries, vendor fees, and the fees referenced in Paragraphs 55 and 56 that Think Finance charged for their marketing activities and underwriting and servicing platforms.

18

76.    GPLS receives an approximate 18% return on its investment, which is guaranteed by Think Finance.

77.    After paying the approximate 18% return to GPLS, the Tribal lenders' expenses, and the Tribal lenders' revenue share, Think Finance retains the remainder of the revenue from the lending businesses. Since Think Finance is a substantial investor in GPLS, Think Finance also receives a substantial portion of the return paid to GPLS.

78.    Think Finance holds most of the financial risk and receives most of the profit from the lending businesses.

**Think Finance and the Tribal Lenders Claim that
Tribal Law Applies to the Consumer Loan Agreements**

79.    At least some of the loan agreements drafted by Think Finance for the Tribal lenders contain a choice-of-law provision that Think Finance says declares that the loans are made and accepted on tribal lands, and pursuant to tribal law, regardless of the consumers' home states or relationship to the tribal lands.

80.    For example, a version of MobiLoans's loan agreement included the following language:

> This Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any State of the United States.

19

81.     Consumers who accessed the Tribal lenders' websites, applied for credit, and signed loan agreements did so from their states of residence.

82.     The Tribal lenders have no storefronts on tribal lands to originate loans in person; consumers applied for loans over the internet.

83.     None of the Tribal lenders offered loans in the states where their tribal lands were located: MobiLoans did not offer loans to consumers in Louisiana, Great Plains did not offer loans to consumers in Oklahoma, and Plain Green did not offer loans to consumers in Montana.

### Think Finance Electronically Credited and Debited Consumers' Bank Accounts

84.     Think Finance, purportedly on behalf of the Tribal lenders, uses non-tribally-affiliated banks to transfer funds to and from consumers in the United States, typically through Automated Clearing House (ACH) credit and debit entries.

85.     Think managed and directed the ACH services that non-tribally-affiliated banks provided to the Tribal lenders.

86.     When consumers were approved for loans, the computer system created, maintained, and operated by Think Finance coordinate the dispersal of funds directly into the consumers' checking accounts, generally through ACH transfers.

87.     The computer system created, maintained, and operated by Think Finance sent automated written messages to consumers reminding them when payments were due. For example, as of December 11, 2015, the email templates Think Finance prepared for Plain Green provided for payment reminders 1, 3, 5, and 7 days before a payment was due. Each such reminder included the amount of the payment and the due date and advised consumers that late payments could cause additional interest to accrue. In addition, as of December 11, 2015, other email templates prepared by Think Finance for Plain Green were intended to remind past-due consumers that the payment was late and, in many templates, the amount of the payment that remained unpaid.

88.     Think prepared similar email templates for Great Plains and MobiLoans.

89.     For example, in one instance on September 7, 2013, a consumer in East Elmhurst, New York received an email ostensibly from Great Plains Account Services. The text of the email was almost an exact match to an email template that Think Finance prepared for Great Plains in June 2011. The email reminded the consumer that her loan payment was past-due and asked her to contact Great Plains immediately by phone or email to prevent further collections activity.

90.     When consumers' loan payments were due, the computer system created, maintained, and operated by Think Finance collected funds directly from the consumers' accounts, generally through ACH transfers.

91.     When consumer loan accounts became past-due, Think Finance generally transferred some of the servicing responsibilities for the accounts to CMS and Yessio. CMS and Yessio made phone calls to consumers to tell them they were required to make payments.

92.     The computer system created, maintained, and operated by Think Finance continued to send out automated written messages to consumers with delinquent accounts informing them that payments were due. For example, an October 2013 template that Think prepared for Great Plains provided:

> "Your Great Plains loan account is now SERIOUSLY PAST DUE. We've made every attempt to contact you with regards to your account and we're still waiting to work with you to discuss payment options. . . If you don't contact us, we may be forced to consider additional collections activity."

93.     When consumer loan accounts became 60-days past-due, Think Finance generally sold the loans to a debt collector.

**Think Finance Told Consumers that the Loans Were Valid**

94.     Think Finance designed, implemented, directed, maintained, and oversaw a lending operation that made loans to consumers in states where state law rendered the loans void or uncollectible. At no point did Think Finance inform

consumers whose loans were void or uncollectible that they were not legally obligated to repay all or some of the principal, interest, and fees of their loan. To the contrary, Think Finance repeatedly and falsely asserted that state law protection did not apply to the loans, and instead, Tribal law applied to the loans.

95.     The loan agreements, which Think Finance drafted, told consumers that their loans were governed by Tribal law, not the law of their state. Consumers were able to access those loan agreements through their personal account page on the Tribal lenders' websites, which were hosted by Think Finance.

96.     Once each loan was disbursed to a consumer, the computer system created and operated by Think Finance communicated directly with the consumer via email or letter and told the consumer, either explicitly or impliedly, that the consumer was required to make payments.

97.     The computer system created and operated by Think Finance also collected funds from consumers' accounts and sent consumers automated emails reminding them to make payments.

98.     If the computer system collected funds electronically, such as through ACH transfers or credit/debit cards, then the system automatically deposited the funds into accounts controlled by Think Finance.

99.     Until the end of 2015, Think Finance was responsible for communicating with consumers by sending written responses to consumer complaints, including complaints regarding the legality of the loans.

100.   The written responses to consumer complaints Think Finance sent to consumers stated explicitly or impliedly that the loans were valid. For example, a November 11, 2013 letter prepared by Think Finance for a MobiLoans consumer in response to that consumer's complaint stated:

> "To answer your questions regarding the legality of this loan, your Account Agreement indicates that your Account is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, (the "Tribe") a sovereign nation recognized by the United States of America. As such, the laws of the Tribe permit Mobiloans to offer the Account in accordance with Tribal law. In addition, Mobiloans, LLC ("Mobiloans") is organized under the laws of the Tribe, is owned and operated by the Tribe, and operates exclusively on land owned by the Tribe. As such, Mobiloans is an "arm of the Tribe" and entitled to sovereign immunity and therefore not subject to any state laws."

**Think Finance Knew that the Loans Were Void**

101.   Since 2011, despite the loan agreement's claim that state law did not apply to the loans, Think Finance has actually maintained lists of states into which the Tribal lenders would not lend. Think Finance's underwriting software would automatically deny a loan application for a consumer who lived in a state on one of these "no-state" lists.

102.   Montana was never on the "no-state" list for Great Plains or MobiLoans.

103.    Think Finance decided which states would be on the "no-state" lists; the Tribal lenders never told Think Finance not to lend in a state.

104.    Think Finance told one of the Tribal lenders that Think Finance might have liability if state Attorneys General claimed that the loans were illegal.

105.    In 2013, Think Finance's then-CEO declared that the Tribal lending model was "extremely vulnerable."

106.    Neither any Defendant nor any Tribal lender sued a consumer for failing to pay on a loan. Instead, Think Finance generally closed consumers' accounts (without demanding repayment) when consumers complained that the loans violated state law.

107.    In May 2014, Think Finance spun off all of its direct lending products to a new company, wholly independent of the Tribal lending products.

## STATE LAWS PROTECTING CONSUMERS
## WHO TAKE OUT SMALL DOLLAR LOANS

108.    Think Finance, the Tribal lenders, CMS, and Yessio have originated, serviced, and/or collected on loans that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render loans, such as those offered by Think Finance and the Tribal lenders, void *ab initio*.

109.    Think Finance, the Tribal lenders, CMS, and Yessio either took these actions directly or used service providers to take these actions on their behalf.

110.   Many states protect consumers from harmful practices associated with the origination, servicing, and collection of certain loans.

111.   Such legal protections include restrictions on the types of entities that may engage in these types of transactions, licensing requirements, and civil and criminal usury limits.

112.   In some states, loans that violate these laws are declared void, meaning that the lender has no legal right to collect, and the borrower is not obligated to pay, some or all of the principal or interest on the loan.

**Interest-Rate Caps**

113.   The following states have enacted laws that render installment loans void if they exceed the usury limit:

    a.   Arkansas, whose state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest," Ark. Const. amend. 89, §§ 3, 6(b).

    b.   Connecticut, whose state statute voids loans under $5,000 made after July 1, 2016 with interest rates in excess of the "interest that is permitted with respect to the consumer credit extended under the Military Lending Act," Conn. Gen. Stat. Ann. § 36a-558(c)(1), (d)(1) (which is 36%, *see* 10 U.S.C. § 987).

c. New Hampshire, which prohibits annual interest rates above 36%
   for loans of $10,000 or less. N.H. Rev. Stat. §§ 399-A:1(XX), 399-
   A:16(I). Loans that do not comply with those restrictions are void,
   and the lender has no right to collect any principal, charges, or
   recompense. N.H. Rev. Stat. § 399-A:23(VIII).

d. New York, which prohibits any person or corporation not licensed
   by the state from "directly or indirectly charg[ing], tak[ing] or
   receiv[ing] any … interest . . . at a rate exceeding" annual interest
   of 16% on covered loans. N.Y. Gen. Oblig. Law § 5-501(2); N.Y.
   Banking Law § 14-a(1). Loans that exceed the rate are void. N.Y.
   Gen. Oblig. Law § 5-511; *see also Szerdahelyi v. Harris*, 490
   N.E.2d 517, 522–23 (N.Y. 1986) ("[A] usurious transaction is void
   *ab initio* . . . .").

e. North Carolina imposes a cap on loans of $25,000 and under that is
   the greater of 16% or the latest published noncompetitive rate for
   U.S. Treasury bills with a six month maturity as of the fifteenth
   day of the month plus 6% rounded to the nearest one-half of one
   percent. N.C. Gen. Stat. § 24-1.1(a)(1), (c). Loans of $15,000 and
   under that violate those provisions are void, and the lender has no

27

right to collect, receive, or retain any principal or charges. N.C. Gen. Stat. § 53-166(a), (d).

f. Since November 16, 2016, South Dakota, in which loans made by money lender licensees with an annual percentage rate above 36% are void and uncollectable; any person evading the usury cap, including by offering loans through the internet or any electronic means, is subject to the same penalties as licensees. S.D. Codified Laws §§ 54-4-44, 54-4-44.1.

114. Colorado prohibits annual interest above 12% on unpaid balances for loans other than supervised loans. Colo. Rev. Stat. §§ 5-1-301(12), (15)(a), (47); 5-2-201(1). For supervised loans, Colorado prohibits a supervised lender from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1,000 and $3,000, and 15% on unpaid balances greater than $3,000, and (b) 21% per year on unpaid balances. *Id.* § 5-2-201(2). Unless a person has been issued a state license or is a depository institution, it may not make or take assignment of and undertake direct collection of payments from supervised loans. Colo. Rev. Stat. § 5-2-301(1). Consumers are relieved of the obligation to pay any charge that exceeds these limits and are entitled to a refund from the lender or assignee for any excess amount that they paid. *Id.* § 5-5-201(2).

115.   These state usury statutes reflect the strong public policy interest in ensuring that consumers who lack negotiating power are protected from loans with excessive interest rates.

116.   Think Finance and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers in Arkansas, Connecticut, New Hampshire, New York, North Carolina, and South Dakota that charged interest at rates exceeding those allowed by the laws of the respective states, and those loans are therefore void.

117.   Think Finance and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers in Colorado that charged interest at rates exceeding those allowed by Colorado law, and consumers were therefore relieved of the obligation to pay charges in excess of the legal limits.

**Licensing Requirements**

118.   The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Arizona, Colorado, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

    a.  ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); Ind. Code § 24-4.5-3-503(2); 209 Mass. Code Regs. 20.03(2); N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:5(I); N.Y. Banking Law § 342); and

    b.  ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as recordkeeping and annual reports (Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-609(A)-(D); Colo. Rev. Stat. §§ 5-2-304, 5-2-305; Mass. Gen. Laws ch. 140, §§ 97–99; N.H. Rev. Stat. §§ 399-A:10, 399-A:11; N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. § 53-184).

119.   These state licensing statutes reflect the strong public policy interest in ensuring that entities seeking to engage in the consumer lending business are vetted and supervised by regulators for compliance with consumer protection and other laws.

120.   Many state laws render small dollar loans void if they are made without a license. If a covered loan is made without a license in the following states, the entity has no right to collect from consumers, or the consumers have no obligation to repay, certain loan amounts:

a. Arizona, which voids covered loans of $10,000 or less that are made or procured without a license, and the lender has no right to collect any principal, finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§ 6-601(5)–(7), 6-602(B), 6-603(A), 6-613(B);

b. Connecticut, which, since June 19, 2015, voids loans of $15,000 or less that charge interest in excess of 12%, when made without a license, Conn. Gen. Stat. Ann. § 36a-558(c);

c. Illinois, which voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013, without a license and at interest rates higher than 99% APR for loans up to $1,500; the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan, 205 Ill. Comp. Stat. §§ 670/1, 670/17.2(a)(1), 670/20(d);

d. Indiana, which voids covered loans made without a license; the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-3-502(3), 24-4.5-5-202(2);

e.  Kentucky, which voids covered loans if the interest rate exceeds the lawful rate—which is the lesser of 4% over the discount rate on ninety-day commercial paper at the Federal Reserve Bank or 19% for loans of $15,000 or less—and the loan is made without a license; the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§ 286.4-420, 286.4-991(1), 360.010(1);

f.  Massachusetts, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% and the loan is made or purchased without a license; the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Laws Ch. 140, §§ 96, 110;

g.  Minnesota, which voids regulated loans made without a required license and requires lenders of up to $100,000 to hold a license in order to issue loans with interest in excess of 21.75% APR, or the total of 33% on the part of the unpaid balance up to $1,125 and 19% a year on the part of the unpaid balance above $1,125, Minn. Stat. Ann. §§ 47.59 subdiv. 3(a), 56.01(a), 56.19, 56.131;

h.  Montana, which requires lenders making consumer loans to hold a license; loans made or collected by anyone other than a licensee or

entity subject to an exemption are void, Mont. Code Ann. § 32-5-103(1), (4);

i. New Hampshire, which voids covered loans of $10,000 or less that are made without a license; the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:2(I), 399-A:23 (VII);

j. New Jersey, which voids consumer loans of $50,000 or less that are made without a license; the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good-faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

k. New Mexico, which voids loans of $5,000 or less made by a person with no license; the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3;

l. New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee; the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

    m. North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license and in excess of the state's general usury law; any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d); and

    n. Ohio, which voids loans of $5,000 or less that are made without a license; the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02.

121.   Colorado relieves the consumer's obligation to pay finance charges to the lender or assignee where the lender or assignee has failed to obtain the requisite license. Colo. Rev. Stat. §§ 5-1-301(17), 5-2-301(1)(a)–(b), 5-5-201(1).

122.   Neither any Defendant nor any Tribal lender was licensed to make loans in any of these states.

123.   Think Finance and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers residing in Arizona, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio, and those loans are void because of Think Finance's and the Tribal lenders' failure to acquire the required licenses.

34

124.   Think Finance and the Tribal lenders made and then, directly and through CMS and Yessio, collected on loans to consumers residing in Colorado, and those consumers were relieved of the obligation to repay finance charges because of Think Finance's and the Tribal lenders' failure to acquire the required licenses.

**Summary of States in Which**
**Think Finance's and the Tribal Lenders' Loans Are Void in Whole or in Part**

125.   Loans originated by Think Finance and the Tribal lenders were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and South Dakota.

126.   Colorado relieves consumers of the obligation to repay excess fees and finance charges for loans that exceed interest rates limits or are issued without a license.

127.   The states listed in Paragraphs 125 and 126 are hereinafter referred to as the "Subject States."

128.   Either directly or through service providers, Think Finance, the Tribal lenders, CMS, and Yessio collected on loans made to consumers in the Subject States that those states' laws voided or limited a consumer's obligation to repay.

129.   From November 1, 2013 through June 1, 2015, Think Finance lent at least $35.2 million to consumers in the Subject States through loans ostensibly offered by Great Plains and Plain Green. During the same time period, Think Finance collected at least $31.7 million in principal and $25.5 million in interest and fees on those loans.

130.   From November 1, 2013 through July 26, 2017, Think Finance lent at least $13.9 million to consumers in the Subject States through lines of credit ostensibly offered by MobiLoans. During the same time period, Think Finance collected at least $13.9 million in principal and collected at least $14.7 million in interest and fees on those lines of credit.

## VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT

### Unfair, Deceptive, and Abusive Acts or Practices

131.   Sections 1031 and 1036 of the CFPA prohibit a "covered person" or "service provider" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

132.   An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

133.   An act or practice is abusive if, among other things, it takes unreasonable advantage of a consumer's lack of understanding of the material risks, costs, or conditions of the product or service. 12 U.S.C. § 5531(d)(2)(A).

## Count I

*Deception Relating to the Collection of Loan Payments*
*that Consumers Did Not Owe – All Defendants*

134.   The Bureau realleges and incorporates by reference Paragraphs 1–133 of this Complaint.

135.   Through the actions set forth above, Think Finance, the Tribal lenders, CMS, and Yessio represented expressly or impliedly that consumers residing in the Subject States had an obligation to repay loan amounts that in fact did not exist, in whole or in part, because the loans violated state licensing or usury laws that declared such loans or loan amounts void *ab initio*.

136.   Through the following actions, Think Finance, the Tribal lenders, CMS, and Yessio reinforced the misrepresentations that consumers were obligated to pay debts that were void, in whole or in part, in the Subject States:

  a.   Drafting loan agreements that declared that Tribal law applied and that consumers were obligated to repay their loans, along with applicable interest and/or fees;

  b.   Maintaining loan agreements for consumers' review on their online account pages, hosted by Think Finance;

37

   c.  Sending written demands for payment;

   d.  Originating ACH debit entries from consumer bank accounts;

   e.  Contacting consumers by telephone to demand repayment;

   f.  Sending consumers with delinquent accounts written messages reminding them that their account was delinquent and that they were obligated to make payments; and

   g.  Responding to consumer complaints by telling consumers the loans were valid and enforceable, consumers were legally obligated to repay, and Think Finance, the Tribal lenders, CMS, and/or Yessio were legally authorized to collect payments.

137.   In numerous instances, consumers residing in Subject States were not under a legal obligation to repay the void amounts.

138.   Think Finance, the Tribal lenders, CMS, and Yessio failed to disclose that they had no legal right to collect certain loan payments because the loans were void, in whole or in part, under state law. Instead, Think Finance, the Tribal lenders, CMS, and Yessio told consumers that the loans were governed by Tribal law, and they were legally authorized to collect on the loans.

139.   Think Finance, the Tribal lenders, CMS, and Yessio failed to disclose that consumers had no legal obligation to pay the loan amounts because they were void, in whole or in part, under state law. Instead, Think Finance, the Tribal

lenders, CMS, and Yessio told consumers that the loans were governed by Tribal law, and consumers were legally obligated to make payments on the loans.

140.   The misrepresentations in Paragraphs 135, 136, 138, and 139 were material and likely to mislead consumers acting reasonably.

141.   The misrepresentations, actions, and omissions of Think Finance constitute deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

142.   The misrepresentations, actions, and omissions of the Tribal lenders, CMS, and Yessio constitute deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count II

*Unfairness Relating to the Collection of Loan Payments*
*that Consumers Did Not Owe – All Defendants*

143.   The Bureau realleges and incorporates by reference Paragraphs 1–133 of this Complaint.

144.   Think Finance, the Tribal lenders, CMS, and Yessio caused substantial injury by servicing, extracting payments for, and collecting on loans that laws in the Subject States rendered void or limited consumers' obligation to repay.

145.   Consumers were unlikely to know that that Subject States' usury laws or licensing requirements rendered the loans void or limited consumers' obligation

to repay, and thus consumers were unable to avoid paying illegal amounts to which Think Finance, the Tribal lenders, CMS, and Yessio were not entitled.

146.   The injuries sustained by consumers residing in the Subject States were not outweighed by countervailing benefits to consumers or to competition.

147.   In many cases, consumers repaid far more money than they actually borrowed.

148.   Lending operations like Think Finance's harm competition because they place lenders that comply with state and federal law at an economic disadvantage as compared to law-abiding businesses. Think Finance reached consumers that law-abiding businesses could not, and avoided the costs of regulatory compliance.

149.   The actions of Think Finance constitute unfair acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

150.   The actions of the Tribal lenders, CMS, and Yessio constitute unfair acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

### Count III

*Abusiveness Relating to the Collection of Loan Payments*
*that Consumers Did Not Owe – All Defendants*

151.   The Bureau realleges and incorporates by reference Paragraphs 1–133 of this Complaint.

152.   The consumer's legal obligation to repay is a material risk, cost, or condition of a loan.

153.   Consumers residing in the Subject States likely were unaware that Think Finance, the Tribal lenders, CMS, and Yessio lacked the legal authority to collect the loans, in whole or in part, because the loans violated usury or licensing laws in those states.

154.   Think Finance, the Tribal lenders, CMS, and Yessio took unreasonable advantage of consumers' lack of understanding regarding the voidness of the loans by collecting amounts to which Think Finance, the Tribal lenders, CMS, and Yessio were not legally entitled, in whole or in part.

155.   The actions of Think Finance constitute abusive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

156.   The actions of the Tribal lenders, CMS, and Yessio constitute abusive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count IV

*Substantially Assisting the Tribal Lenders, CMS, and Yessio – All Defendants*

157.   The Bureau realleges and incorporates by reference Paragraphs 1–133 of this Complaint.

158.   The Tribal lenders, CMS, and Yessio described in Paragraphs 10 and 28-44 are "covered person[s]" engaged "in offering or providing a consumer

41

financial product or service" because they extend, service, and collect on consumer loans. 12 U.S.C. § 5481(5), (6), (15)(A)(i), (15)(A)(x).

159.   The Tribal lenders, CMS, and Yessio committed deceptive, unfair, and abusive acts or practices by demanding payment for and collecting debts that were void or that consumers were not required to repay.

160.   These deceptive, unfair, and abusive acts or practices violated 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

161.   Think Finance provided substantial assistance to the Tribal lenders, CMS, and Yessio in the commission of these deceptive, unfair, and abusive acts by overseeing, directing, or administering the origination of and collection of loan amounts that were void, in whole or in part.

162.   Think Finance acted knowingly or recklessly in providing this substantial assistance.

163.   Think Finance's actions constituted violations of section 1036(a)(3) of the CFPA, 12 U.S.C. § 5536(a)(3).

## **PRAYER FOR RELIEF**

164.   Wherefore, the Bureau, pursuant to sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

a.  Permanently enjoin Defendants from committing future violations of the CFPA or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.  Grant additional injunctive relief as the Court may deem to be just and proper;

c.  Award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including but not limited to restitution and the refund of monies paid;

d.  Order disgorgement of Defendants' ill-gotten gains;

e.  Award civil money penalties;

f.  Award the costs of bringing this action; and

g.  Award additional relief as the Court may determine to be just and proper.


Dated: March 28, 2018                   Respectfully submitted,

                                        Kristen A. Donoghue
                                        *Enforcement Director*

                                        Deborah Morris
                                        *Deputy Enforcement Director*

                                        Craig Cowie
                                        *Assistant Litigation Deputy*

/s/ Vanessa Buchko
Vanessa Buchko
Benjamin Vaughn
Adrienne Warrell
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Buchko): 202-435-9593
Telephone (Vaughn): 202-435-7964
Telephone (Warrell): 202-435-7013
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Benjamin.Vaughn@cfpb.gov
E-mail: Adrienne.Warrell@cfpb.gov
*Attorneys for Consumer Financial
      Protection Bureau*

## CERTIFICATE OF SERVICE

I, Vanessa Buchko, certify that on March 28, 2018, I served the foregoing

document on all counsel of record via the Court's CM/ECF system.  The document

is available for viewing and downloading from the ECF system.

/s/ Vanessa Buchko
Consumer Financial Protection Bureau