**UNITED STATES DISTRICT COURT**
**DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff,*

v.

THINK FINANCE, LLC, formerly known as Think Finance, Inc., THINK FINANCE SPV, LLC, FINANCIAL U, LLC, TC LOAN SERVICE, LLC, TAILWIND MARKETING, LLC, TC ADMINISTRATIVE SERVICES, LLC, and TC DECISION SCIENCES, LLC

*Think Entities.*

Case No. 4:17-cv-00127-BMM

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS


INTRODUCTION ....... 1

FACTUAL BACKGROUND ....... 4

- I. The Tribal Lenders and Think Entities ....... 4
- II. The Loan Agreements ....... 7

ARGUMENT ....... 9

- I. The structure of the CFPB is unconstitutional and so the Complaint must be dismissed. ....... 9
- II. The CFPB's claims are not permitted by the CFPA. ....... 12
  - A. The CFPA does not allow UDAAP claims based exclusively in state law, with no grounding in existing Federal law. ....... 12
    - a. Counts I-III are not brought "under Federal law." ....... 13
    - b. The CFPB cannot declare "Federal law" through this suit. ....... 15
  - B. The claims based on violations of state usury laws should be dismissed because the CFPB may not impose interest rate limits. ....... 18
- III. The Complaint fails to, and cannot, join indispensable parties. ....... 19
- IV. The Court lacks personal jurisdiction over Think SPV. ....... 22
- V. The Complaint fails to state cognizable claims under the CFPA. ....... 24
  - A. The Complaint improperly lumps together all Think Entities. ....... 24
  - B. Count I fails to state a claim for deceptive conduct. ....... 26
  - C. Count II fails to state a claim for unfair conduct. ....... 29
  - D. Count III fails to state a claim for abusive conduct. ....... 30
  - E. Count IV fails to state a substantial assistance claim. ....... 31
- VI. The statute of limitations bars claims against the Subsidiaries related to conduct arising prior to March 28, 2015. ....... 32

CONCLUSION ....... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allan G. Holms, Inc. v. Mraz*,
No. 06-CV-26, 2006 WL 2506044 (D. Mont. Aug. 28, 2006) ..................... 22, 23

*Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*,
480 F.3d 470 (7th Cir. 2007) ..................... 14

*BNSF Ry. Co. v. Tyrrell*,
137 S. Ct. 1549 (2017) ..................... 23

*Bond v. United States*,
134 S. Ct. 2077 (2014) ..................... 14, 15

*Bowsher v. Synar*,
478 U.S. 714 (1986) ..................... 10

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ..................... 26

*CFPB v. Cashcall, Inc.*,
No. 15-07522, 2014 WL 485963 (C.D. Cal. Jan. 19, 2018) ..................... 30

*CFPB v. D & D Mktg.*,
No. 15-cv-9692, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ..................... 29

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ..................... 28

*CFPB v. Great Plains Lending, LLC*,
846 F.3d 1049 (9th Cir. 2017) ..................... 21

*CFPB v. Intercept Corp.*,
No. 16-cv-144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017) ..................... 30, 31, 32

*CFPB v. Prime Mktg. Holdings, LLC*,
No. 16-cv-7111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) .......... 13, 26, 27

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ..................... 16

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937)....................11

*Clinton v. Babbitt*,
180 F.3d 1081 (9th Cir. 1999)....................22

*Commonwealth of Pa. v. Think Finance, Inc.*,
No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016)....................26

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012)....................28, 29

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*,
276 F.3d 1150 (9th Cir. 2002)....................19, 20, 21, 22

*Delgado v. Ocwen Loan Servicing, LLC*,
No. 13-CV-4427, 2014 WL 4773991 (E.D.N.Y. Sept. 24, 2014)....................29

*Desertrain v. City of L.A.*,
754 F.3d 1147 (9th Cir. 2014)....................17

*Free Enter. Fund v, Public Co. Accounting Bd.*,
561 U.S. 477 (2010)....................11

*FTC v. IFC Credit Corp.*,
543 F. Supp. 2d 925 (N.D. Ill. 2008)....................30

*Howard v. Plain Green, LLC*,
--- F.3d ----, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017)....................20

*Illinois v. CMK Invs., Inc.*,
No. 14-C-2783, 2014 WL 6910519 (N.D. Ill. Dec. 9, 2014)....................19

*In re Lyondell Petrochemical Co. Sec. Litig.*,
984 F.2d 1050 (9th Cir. 1993)....................28

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978)....................9

*Myers v. United States*,
272 U.S. 52 (1926)....................9

*NLRB v. Bell Aerospace Co. Div. of Textron Inc.*,
416 U.S. 267 (1974)....................16

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016)....................12, 17

*Potter v. Dark Horse Comics, Inc.*,
No. 16-cv-2090, 2017 WL 2642973 (D. Or. May 17, 2017) ....................25

*Ross v. First Savings Bank of Arlington*,
675 N.W.2d 812 (Iowa 2004)....................24

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981)....................9

*Stevens v. Corelogic, Inc.*,
194 F. Supp. 3d 1046, 1052 (S.D. Cal. 2016) ....................27

*Union Pac. R.R. Co. v. Runyon*,
320 F.R.D. 245 (D. Or. 2017)....................20

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)....................21

*Walden v. Fiore*,
134 S. Ct. 1115 (2014)....................24

*Wessa v. Watermark Paddlesports, Inc.*,
No. C06-5156, 2006 WL 1418906 (W.D. Wash. May 22, 2006)....................28

*Wiener v. United States*,
357 U.S. 349 (1958)....................10

**Statutes**

12 U.S.C. § 5481(6) ....................20

12 U.S.C. § 5481(26)(A)....................20

12 U.S.C. § 5481(27) ....................21

12 U.S.C. § 5491(c)(3)....................10

12 U.S.C. §§ 5497(a)(1)....................10

12 U.S.C. § 5497(a)(2) ..... 10

12 U.S.C. § 5497(a)(2)(C) ..... 11

12 U.S.C. § 5517(o) ..... 18, 19

12 U.S.C. § 5531(a) ..... 12, 14, 20

12 U.S.C. § 5531(a) ..... 13

12 U.S.C. § 5531(b) ..... 13

12 U.S.C. § 5531(c)(1) ..... 14

12 U.S.C. § 5531(c)(1)(A) ..... 29

12 U.S.C. § 5531(c)(1)(A)(B) ..... 29, 30

12 U.S.C. § 5531(c) ..... 3, 13

12 U.S.C. § 5531(d) ..... 3, 13, 14, 31

12 U.S.C. § 5531(e) ..... 13

12 U.S.C. § 5536(a)(3) ..... 32

12 U.S.C. § 5564(g) ..... 32

Mont. Code § 32-5-207 ..... 15

Mont. Code § 401-402 ..... 15

Ohio Rev. Code § 1321.10 ..... 15

**Other Authorities**

156 Cong. Rec. H5239 (2010) ..... 11

82 Fed. Reg. 54472-01 (Nov. 17, 2017) ..... 7

Barry Nielsen, *Behind the Scenes of Your Mortgage*, Investopedia (Nov. 28, 2017), https://www.investopedia.com/articles/pf/07/secondary_mortgage.asp (last visited April 24, 2018) ..... 5

Dan Frosch & Alan Zibel, "*Tribes' Online Lending Faces Federal Squeeze*," Wall St. J., July 23, 2014, *available at* https://www.wsj.com/articles/tribes-online-lending-squeezed-by-regulators-1406158967 ....... 6

Fed. R. Civ. P. 9(b) ....... 26, 27, 28

Fed. R. Civ. P. 19(b) ....... 21

Gavin Clarkson, Katherine A. Spilde, and Carma M. Clah, *Online Sovereignty: The Law and Economics of Tribal Electronic Commerce*, 19 Vand. J. of Ent. & Tech. Law 1 (2016) ....... 6

Message from Mick Mulvaney, April 2018 Semi-annual report of the CFPB, *available at* https://www.consumerfinance.gov/data-research/research-reports/semi-annual-report-fall-2017/ ....... 10

Mont. R. Civ. P. 4(b)(1) ....... 24

Montana Office of Public Instruction, Montana Indians: Their History and Location, *available at* http://opi.mt.gov/Portals/182/Page%20Files/Indian%20Education/Indian%20Education%20101/Montana%20Indians%20Their%20History%20and%20Location.pdf ....... 6

U.S. Const. art. I, § 8, cl. 1 ....... 11

# INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB" or "Bureau") contends that certain consumer loans made by Native American Tribes violated the interest rate limits and/or lending licensing laws of seventeen states (the "Subject States"), and brings this action under federal law because the loans were collected upon after being made. But rather than sue the lenders—three sovereign, arm of the tribe companies (the "Tribal Lenders")—or sue under any of the Subject States' laws, and rather than leave the matter to state authorities that generally possess ample enforcement mechanisms to address state lending-law violations, the CFPB sues several third-party service providers to the Tribal Lenders, Think Finance, LLC and six of its subsidiaries (the "Subsidiaries", collectively with Think Finance, LLC, the "Think Entities") and solely brings claims dependent on state law. Yet, because the CFPB's multi-year investigation revealed that the Think Entities had little or no involvement in the collection of the loans, the allegations that the Think Entities violated federal law in collecting these loans are threadbare. Not surprisingly, this indirect challenge to tribal lending using state law, targeted at companies that did not originate the loans, yields a number of deficiencies that require the dismissal of the Amended Complaint ("Complaint" or "Compl."), which has not corrected those same deficiencies from the original Complaint.

First, the over-reaching (and misdirected) claims in this case are a symptom of the fact that the CFPB is an unconstitutionally-structured agency. The Consumer Financial Protection Act ("CFPA"), which created the CFPB, insulated the CFPB's Director from accountability to the President and Congress. This is a problem that can only be fixed with legislation.

Second, the Complaint must be dismissed because the Bureau cannot sue for violations of state law. The Complaint brings three causes of action on the theory that the Think Entities engaged in, respectively, deceptive (Count I), unfair (Count II), and abusive (Count III) practices (so-called "UDAAP") in connection with collecting the loans. The CFPB claims the collection activities were improper because the loans allegedly were void under state law (due either to local usury limits or state statutory licensing rules). Compl. ¶¶ 135-39, 144-45, 153-54. The Complaint adds a fourth, derivative cause of action (Count IV) for "substantially assisting" the Tribal Lenders and two third-party debt collectors in their allegedly improper collection of the loans; the asserted concern is, again, that the loans allegedly were void under state law. *Id.* ¶ 159. The CFPA provides no authority for the Bureau to enforce state laws in this manner. Instead, the CFPA only authorizes the agency to pursue unfair, deceptive or abusive actions "under Federal law" and specifically prohibits the Bureau from enforcing "usury limits". On these grounds alone, the case must be dismissed.

Sensibly, the CFPA also requires the Bureau to define what is a UDAAP *before* the Bureau files suit to enforce the law, thus prohibiting regulation by enforcement. 12 U.S.C. §§ 5531(c)-(d). The CFPB has done no such thing with respect to UDAAP, as it has never issued rulemaking or relevant guidance of any meaningful sort. Apart from but related to this failing, the CFPB cannot declare through a lawsuit that collecting on a debt supposedly barred under state law is a UDAAP, as that would violate both fair notice and Due Process principles.

Third, the Complaint must be dismissed because it fails to join indispensable parties that cannot be sued by the Bureau, the Tribal Lenders. The Complaint challenges the legality of the Tribal Lenders' loans with borrowers, yet does not and cannot join the Tribal Lenders because those entities are immune from suit under the CFPA.

Fourth, the Complaint must be dismissed as to defendant Think Finance SPV, LLC ("Think SPV") because the Court lacks personal jurisdiction over that entity, which has no relevant contacts with Montana.

Fifth, even if the CFPB could get past these fundamental flaws, the Complaint's four counts fail to state plausible claims for relief. Indeed, the CFPB skips over elements of each of the claims, often offering nothing but the most cursory of allegations and using improper group pleading to try to hide the weaknesses of the claims. One could guess that the myriad failings are because of

the difficulty the CFPB had in marrying its novel claims to the facts, but the ultimate reason for these deficiencies is irrelevant because these defects in each count require dismissal no matter the cause.

For the reasons above, and the additional reasons explained below, the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I. The Tribal Lenders and Think Entities

The Tribal Lenders are three consumer lenders that are each owned and controlled by a Native American Tribe. Compl. ¶¶ 28-30. Great Plains Lending, LLC ("Great Plains") is owned by the Otoe-Missouria Tribe of Oklahoma; MobiLoans, LLC ("MobiLoans") is owned by the Tunica Biloxi Tribe of Louisiana; and Plain Green, LLC ("Plain Green") is owned by the Chippewa Cree Tribe of Montana. *Id.*

The Tribal Lenders offered "small-dollar," unsecured consumer installment loans through advertising over the Internet. Compl. ¶¶ 28-30, 52. Once a borrower applied, the loan was risk-scored and approved or denied based on each Tribal Lender's decision as to what levels of risk it was willing to take on. *Id.* ¶ 69. The loans were made by the Tribal Lenders, direct to the borrower. *Id.* ¶¶ 28-30, 80. Once originated, the Tribal Lenders kept all loans in their names, maintained an ownership interest in the loans and thus shouldered risk, and sold

participation interests in the loans' performance. *See id.* ¶ 72. That the Tribal Lenders sold a participation interest in the loans to investors after origination is a commonplace feature of modern-day financing; the mortgage market works in an even more truncated way, for example, with the entire interest in a mortgage often changing hands and with servicing rights also frequently being sold and resold.[1] Apart from these economic arrangements, the Tribal Lenders provided customer service and other support services to the consumer borrowers, through on-reservation employees. *See id.* ¶¶ 53-54.

The economic benefits and activity generated from the Tribal Lenders' lending businesses provided considerable benefits to both the Tribes and the borrowers. As the Court is doubtless aware, Native American Tribes and their members have in many instances struggled economically. A 2010 State of Montana publication, issued before the Tribal Lenders' relationship with the Think Entities began, described the Chippewa Cree Tribe's Rocky Boy's Reservation as experiencing "distressed" economic conditions, with unemployment up to 70% in winter months.[2] Consumer lending on tribal lands, like that done by the Tribal

---

[1] *See* Barry Nielsen, *Behind the Scenes of Your Mortgage*, Investopedia (Nov. 28, 2017), https://www.investopedia.com/articles/pf/07/secondary_mortgage.asp (last visited April 24, 2018).

[2] Montana Office of Public Instruction, *Montana Indians: Their History and Location* at 82, *available at* http://opi.mt.gov/Portals/182/Page%20Files/Indian%20Education/Indian%20Educ

Lenders whose loans are at issue in this case, has been described as a "path out of poverty and crushing 50% unemployment" and a "bridge to self-sufficiency."[3] These programs have worked; for example, the Otoe-Missouria Tribe has been able to invest the revenue it generated through Great Plains consumer lending into housing renovation and creation for that Tribe's members.[4]

Consumers taking out the types of loans the CFPB now seeks to declare void also benefit; for many, the loans are an opportunity to access credit that they could not receive from other sources. In issuing a rule to govern a type of small-dollar lending, "payday" loans, the CFPB reported having received "[h]undreds of thousands" of comments supporting the product, many "indicat[ing] [that borrowers on such loans] had no alternative to payday products because they lacked credit for credit cards and could not borrow from family or friends or relatives."[5]

Certain of Think Finance's Subsidiaries assisted these lending operations by providing marketing and technology services to the Tribal Lenders, starting in

---

ation%20101/Montana%20Indians%20Their%20History%20and%20Location.pdf

[3] Dan Frosch & Alan Zibel, "*Tribes' Online Lending Faces Federal Squeeze*," Wall St. J., July 23, 2014, *available at* https://www.wsj.com/articles/tribes-online-lending-squeezed-by-regulators-1406158967.

[4] *See* Gavin Clarkson, Katherine A. Spilde, and Carma M. Clah, *Online Sovereignty: The Law and Economics of Tribal Electronic Commerce*, 19 Vand. J. Ent. & Tech. L. 1, 20-22 (2016).

[5] 82 Fed. Reg. 54472-01, 54515-16 (Nov. 17, 2017).

2011. Compl. ¶¶ 9, 13, 17, 21. The Complaint does not allege that any of the Think Entities were parties to the loans.

Generally, the Complaint lumps the Subsidiaries and Think Finance together as "Think Finance." *See id.* ¶¶ 15-27. With respect to the collection of the loans, the CFPB alleges that "Think Finance" provided various support to the Tribal Lenders and third-party debt collectors in actions those entities took to collect and speculates that one consumer received one email sent by Great Plains Account Services similar to a template drafted by "Think Finance" (*id.* ¶ 89), but only alleges two sorts of collection activity by "Think Finance," one direct and one indirect: that it "communicat[ed] with consumers by sending written response to consumer complaints" and operated a computer system that sent past-due notices to borrowers. *Id.* ¶¶ 92, 99. The Subsidiaries stopped assisting Plain Green in June 2016 and Great Plains and MobiLoans stopped originating new loans supported by the Subsidiaries' services in early 2017. *Id.* ¶¶ 28-30; Dkt. No. 13 at 4 & n.1.

## II. The Loan Agreements

The CFPB does not allege that ***any*** borrower was misled as to the interest rate or fees of her loan, nor that ***any*** borrower failed to receive the benefit of their bargain with the Tribal Lenders. *See generally* Compl. Indeed, noticeably absent from the Complaint is any mention of the robust consumer disclosures that

accompanied the loans and disclosed their interest rates and fees. *E.g.*, Rosenberg Decl. Ex. 1 at 1-2 (Plain Green); *id.* Ex. 2 at 1-2 (Great Plains); *id.* Ex. 3 at 4 (MobiLoans).[6] In particular, for example, the MobiLoans agreements disclosed to potential borrowers that: "**MobiLoans credit is an expensive form of credit . . . designed to help customers meet their short-term borrowing needs [that] is not intended to provide a solution for longer-term credit or other financial needs.**" *Id.* Ex. 3 at 1 (emphasis in original).

Additionally, while the Complaint points out that "[a]t least some of the loan agreements" contained a choice of law provision stating that the law of the respective Tribe applied to the contract (Compl. ¶¶ 79-80), it omits to allege facts known to the CFPB from its pre-suit investigation that many borrowers had to additionally check a box confirming that they understood that the laws of the Tribes would govern the loans, not the laws of the borrower's home state. *See, e.g.*, Rosenberg Decl. Ex. 1 at 8 (Plain Green). There is nothing surprising or unusual about the Tribal Lenders and borrowers agreeing that tribal law would serve as governing law for the loans at issue. Indeed, the Supreme Court has upheld a similar choice-of-law arrangement, holding that the interest-rate ceilings that apply to a national bank are those of the state in which the bank is located, not

---

[6] The Think Entities provide this discussion for context so the Court is aware that the Complaint is not complete.

those of the state in which its customers are located. *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313 (1978).

## ARGUMENT

### I. The structure of the CFPB is unconstitutional and so the Complaint must be dismissed.

Two facets of the CFPB, when taken together, transform it into an unconstitutional anomaly. Because these structural defects cannot be cured without curative legislation, the Complaint should be dismissed.

First, the CFPB is unconstitutional because it is structured to have Executive powers while also simultaneously being unanswerable to the President.

The Constitution, in Article II, grants only the President the power to control and supervise the Executive Branch. *Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981). The President's attendant "powers of appointment and removal," *id.*, necessarily mean that the President has exclusive authority to decide which individuals will assist him in enforcing the law, *Myers v. United States*, 272 U.S. 52, 121-22 (1926). Part and parcel of the power to appoint is the President's exclusive "power of removal." *See Bowsher v. Synar*, 478 U.S. 714, 725-26 (1986).

The CFPB's Director stands as an unconstitutional exception to these well-established principles. The CFPA provides that the President may not remove the Director except for "inefficiency, neglect of duty, or malfeasance in office," or at

the end of a five-year term. 12 U.S.C. § 5491(c)(3). These restrictions deny the President the ability to appoint a Director of his choosing who agrees with him and restricts his Constitutional mandate to ensure faithful execution of the laws. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958). The Department of Justice agrees that this structural anomaly makes the CFPB's structure unconstitutional. Br. for the United States as Amicus Curiae, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 17, 2017).[7]

Second, the CFPB is infirm because it has the unchecked power to dictate and control its own budget without any effective oversight.

Under the CFPA, the Director self-appropriates, by instructing the Federal Reserve to transfer to the CFPB whatever amount of money that the Director determines is appropriate to carry out the CFPB's functions (subject to a cap). 12 U.S.C. §§ 5497(a)(1)-(2). By statute, the House and Senate Appropriations Committees are barred from reviewing how the CFPB spends the money it appropriates to itself. *Id.* § 5497(a)(2)(C).

This arrangement unconstitutionally blocks the supervisory function attendant to Congress's exclusive power to direct federal spending and exercise oversight over federal agencies. The Appropriations Clause, U.S. Const. art. I, § 8,

[7] The Bureau's Acting Director has echoed these concerns. Message from Mick Mulvaney, April 2018 Semi-annual report of the CFPB, *available at* https://www.consumerfinance.gov/data-research/research-reports/semi-annual-report-fall-2017/.

cl. 1, is intended as "a restriction upon the disbursing authority of the Executive department," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). Because the CFPB can appropriate funds for itself, Congress cannot use the power of the purse to reach judgments as to whether the agency is properly using federal funds. This absence of any meaningful fiscal oversight is unconstitutional.

The only appropriate remedy for these twin deficiencies is to hold the CFPB unconstitutional as currently structured, and dismiss this lawsuit until Congress puts a constitutional agency and Director in place. Because "it is evident that the Legislature would not have enacted those [flawed] provisions . . . independently of that which is [invalid]," only Congress may remedy the CFPB's defects. *See Free Enter. Fund v, Public Co. Accounting Bd.*, 561 U.S. 477, 508-09 (2010). In enacting Dodd-Frank and creating the CFPB, Congress expressed its desire to have a "completely independent" agency, "with an independently appointed director, an independent budget, and an autonomous rulemaking authority." 156 Cong. Rec. H5239 (2010) (Rep. Maloney). While the CFPA contains a severability clause, judicial rewriting of the CFPA to try to make it constitutional is impermissible given the inconsistency with this legislative record.[8]

---

[8] Aspects of this constitutionality argument are pending before the Ninth Circuit, upon interlocutory review. *See CFPB v. Seila Law LLC*, No. 17-56324 (9th Cir. filed Sept. 1, 2017); *CFPB v. D&D Mktg., Inc.*, No. 17-55709 (9th Cir. filed May 18, 2017). The Think Entities note that a panel of the D.C. Circuit Court of Appeal held the CFPB to be unconstitutional based on Article II concerns, but the en banc

## II. The CFPB's claims are not permitted by the CFPA.

The CFPB's powers are admittedly broad, but they are not unlimited. This action falls outside of those powers for two reasons: (i) it goes far beyond the type of UDAAP lawsuits authorized by the CFPA, and (ii) it is an improper attempt to create interest rate limits, which the CFPB lacks the statutory authority to do.

### A. The CFPA does not allow UDAAP claims based exclusively in state law, with no grounding in existing Federal law.

Like all federal agencies, the CFPB is limited to exercising those powers granted by its enabling statute, in this case the CFPA. With respect to UDAAP claims, the CFPA authorizes the Bureau to pursue an enforcement action to prevent "an unfair, deceptive, or abusive act or practice ***under Federal law***" in connection with a consumer financial product or service. 12 U.S.C. § 5531(a) (emphasis added). To exercise this power, the Bureau is authorized to "prescribe rules" identifying practices that constitute UDAAP violations under Federal law; in fact, the CFPA specifically presumes that the Bureau will "declare" the types of conduct it believes constitute such violations and the CFPA sets limits on such declarations. *Id.* §§ 5531(a)-(b) (discussing regulation authority and requirements); *id.*§§ 5531(c)-(e) (prohibiting Bureau from declaring certain acts as unfair or

---

court recently reversed that ruling in a divided opinion. *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016) (finding CFPB's structure unconstitutional), *rev'd in part* 881 F.3d 75 (D.C. Cir. 2018).

abusive; requiring consultation before UDAAP rulemaking).[9]

This structure necessarily contemplates two related principles: (1) that the Bureau's UDAAP authority is limited to claims alleging unfair, deceptive, or abusive practices as identified "under Federal law," which the Bureau can declare through rulemaking; and (2) that the Bureau will make such declarations *before* suing under new theories of purportedly unfair, deceptive, or abusive practices. This suit violates both of these principles.

**a. Counts I-III are not brought "under Federal law."**

The Bureau does not claim any Federal law, regulation, or rule is at-issue here beyond the general UDAAP authority in the CFPA. *See generally* Compl. This defect requires dismissal; under a straightforward interpretation of the CFPA, the Bureau cannot sue for an alleged UDAAP violation that has no grounding in existing "Federal law."

In truth, rather than seeking to enforce "Federal law," the CFPB is actually attempting to pursue alleged violations of state law through amorphous UDAAP claims. *See* Compl. ¶¶ 135, 145, 153, 159. But the CFPB does not have the

---

[9] Deceptive practices are not specifically defined under the CFPA, but the CFPA's requirement that the CFPB "declare" unfair or abusive acts informs the interpretation of the notice the CFPB must provide before creating new novel theories of what could constitute a deception. *See CFPB v. Prime Mktg. Holdings, LLC*, No. 16-cv-7111, 2016 WL 10516097, at *5 (C.D. Cal. Nov. 15, 2016) (claims for deceptive conduct under the CFPA must meet a heightened pleading standard).

authority to enforce state law through the CFPA, either directly or indirectly. Absent "clear indication[s]" that are "reasonably explicit," federal law is not presumed to incorporate state law. *Bond v. United States*, 134 S. Ct. 2077, 2089-92 (2014). This rule preserves the "constitutional balance between the National Government and the States." *Id.*

No such clear indication is found within the CFPA. Instead, Congress only gave the CFPB the authority to prevent "unfair, deceptive, or abusive act[s] or practice[s] under ***Federal law***." 12 U.S.C. § 5531(a) (emphasis added). The CFPA is entirely devoid of any reference to state law in defining UDAAP terms, and it is similarly silent as to the possibility that the Bureau is authorized to enforce state law through the UDAAP process. *See e.g.*, 12 U.S.C. § 5531(c)(1) (unfair definition); *id.* § 5531(d) (abusive definition); *see also Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007) (FDCPA did not apply to alleged violations of state law because the FDCPA "does not so much as hint at being an enforcement mechanism for other rules of state . . . law").

The CFPB's attempt in this lawsuit to transform alleged violations of seventeen different state laws into federal violations of the CFPA upsets the balance between the federal government and the states at issue. By seeking to enforce the Subject States' laws for those states, when all presumably have reached deliberate and considered decisions on how to interpret and enforce their own laws,

the CFPB is treading on the core legal principle that the federal government may not "displace" the public policy of the states. *Bond*, 134 S. Ct. at 2092-93.

The Subject States have their own mechanisms for enforcing the laws that the CFPB cites, which are informed by each state's unique public policy formulation and considerations. For example, among just two of the cited state laws, Montana's Department of Administration is empowered to investigate suspected violators of Montana's licensing law and seek "civil penalties" (Mont. Code §§ 32-5-207, 401-402) and Ohio permits its regulators to seek only injunctive relief against those that violate its usury laws (Ohio Rev. Code § 1321.10). Where neither of these or other states have sought to use their statutory powers to pursue interest rate or licensing concerns with the Tribal Lenders (or even non-lender Think Entities), it would be wholly inappropriate under the CFPA for the Bureau to usurp those judgments.

In any event, Congress has already restricted the CFPB from trampling on the sovereignty of states in this way, by limiting its UDAAP jurisdiction to violation of "Federal law." None of the cited statutes that supposedly void the subject loans are federal statutes or otherwise qualify as "Federal law." As a result, dismissal is required.

#### b. The CFPB cannot declare "Federal law" through this suit.

The Bureau can be expected to argue that a state-law violation can transform

into a UDAAP, remediable under CFPA, because federal law broadly prohibits unfair, deceptive or abusive practices. But even if that is correct, the Bureau cannot interpret UDAAP as covering collection of a debt illegal under state law unless it first declares in advance that such conduct violates the CFPA. Here, the Bureau has failed to promulgate *a single rule* meaningfully explaining what is unfair, deceptive, or abusive under the CFPA, or explained the meaning of those terms through any adjudication. To sue the Think Entities based on the theory that it was a UDAAP to participate in the collection of loans supposedly void under some state laws is improper and beyond the Bureau's authority for at least three reasons.

First, the CFPB cannot "declare" anything by pursuing litigation on a set of facts for the first time in court. *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). Instead, such declarations must come in the form of an agency proceeding—either rulemaking or a completed adjudication. *NLRB v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 295 (1974). The CFPB's attempt to skip public rulemaking or adjudication and instead unilaterally declare practices illegal in litigation is contrary to the statutory authority under which it is required to operate.

Second, there is a critical distinction between this case and traditional UDAAP cases in that, here, the CFPB is claiming the underlying deception is an

alleged misrepresentation of law, *i.e.* that the loans are enforceable. *See* Compl. ¶¶ 79, 125-26. This matters because the CFPB's theory that these state laws apply to the loans, rather than tribal laws, and that each of these state laws void or otherwise restrict the collection of the loans, is, at best for the CFPB, an area of law without any direct precedent. No provision in the CFPA or any other Federal statue allows this type of suit, which is simultaneously both novel and retroactive. *See PHH Corp.*, 839 F.3d at 44 (the CFPB may not newly interpret a statute and then apply that interpretation retroactively), *aff'd in part*, 881 F.3d at 83.

The CFPB's attempts to "declare" the law for the first time through this case violate not only the CFPA, but also traditional notions of Due Process. In the absence of guidance from the CFPB regarding what is unfair, deceptive, or abusive conduct under the CFPA, the Think Entities were left with what the Due Process Clause forbids in the first place: "guess[ing] at [the] meaning." *Desertrain v. City of L.A.*, 754 F.3d 1147, 1155 (9th Cir. 2014).

These concerns are particularly acute here. The CFPB is suing over alleged violation of state laws, yet it makes no claim in its Complaint that the seventeen Subject States agree with the CFPB's legal position, let alone that those states have ever put the public on notice that the states believe this lending conduct violates each of their laws. Indeed, the state authorities who police compliance with usury or licensing rules in each of the Subject States may well be in vehement

disagreement, either with the position the CFPB is taking as to what their state law is or with the fact that the CFPB is arrogating to itself the right to decide whether, when, and how to enforce their laws. It is acutely unfair for the Think Entities to face a suit based on guesswork by the CFPB as to whether each of these seventeen states' laws were violated.

### B. The claims based on violations of state usury laws should be dismissed because the CFPB may not impose interest rate limits.

The Bureau's lawsuit is also extraordinary in that it attempts to indirectly enforce an area of law that the Bureau is *prohibited* from directly enforcing—interest rate caps—and it attempts to do so indirectly by suing service providers rather than directly suing the Tribal Lenders. *See* Compl. ¶¶ 113-17. The CFPA explicitly prohibits the Bureau from establishing a limit on interest rates. *See* 12 U.S.C. § 5517(o) ("No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit[.]"). This prohibition is incompatible with the basic premise of the Bureau's lawsuit, which can be read as nothing other than an attempt to establish that every single state usury law limit is also a de facto Federal usury limit. But that cannot be the case as a matter of statutory interpretation because it cannot be reconciled with § 5517(o). *See Illinois v. CMK Invs., Inc.*, No. 14-C-2783, 2014 WL 6910519, at *7 n.5 (N.D. Ill. Dec. 9, 2014) (concluding that the plaintiff could not challenge a fee as "usurious" under the CFPA).

## III. The Complaint fails to, and cannot, join indispensable parties.

Although the Complaint challenges as void loan products issued by the Tribal Lenders, the Bureau does not seek to join these indispensable parties. Nor can the Tribal Lenders be joined; due to sovereign immunity principles, the Tribal Lenders may not be sued by the Bureau under the CFPA. The Complaint should therefore be dismissed.

To determine whether a complaint should be dismissed for failure to join an indispensable party that cannot be joined, the Ninth Circuit first asks whether the absent parties are necessary, then whether they cannot be joined, and finally whether the absent parties are indispensable. *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002). All three are true here.

First, the Tribal Lenders—Plain Green, Great Plains, and Mobiloans—are necessary parties. The Bureau seeks a finding that loans executed by the Tribal Lenders are governed by and void under state usury and/or licensing laws of various states rather than tribal law as chosen by the parties to the loans. *See, e.g.*, Compl. ¶¶ 125-26. This is the paradigmatic case where an absent party is necessary because their contractual interests could be impaired. As the Ninth Circuit held in a case seeking to void a preferential hiring policy of the Navajo Nation incorporated into a contract executed by that Tribe, it is a "fundamental

principle" that "a party to a contract is necessary . . . to litigation seeking to decimate that contract." *Dawavendewa*, 276 F.3d at 1157. As in *Dawavendewa*, "a judgment rendered in the [Tribal Lenders'] absence will impair [the Tribes'] sovereign capacity to negotiate contracts." *See id.*[10]

Second, the Tribal Lenders are immune from suit under the CFPA and may not be joined. The CFPA only permits the Bureau to take enforcement actions against "covered person[s]" or "service provider[s]," both of which are defined to include only "persons". 12 U.S.C. § 5531(a); *see also id.* §§ 5481(6), (26)(A). However, the Tribal Lenders are owned by the Tribes and therefore are arms of those sovereign entities and not persons. *See* Compl. ¶¶ 28-30; *see also Howard v. Plain Green, LLC*, --- F.3d ----, 2017 WL 3669565, at *4 (E.D. Va. Aug. 7, 2017) (Plain Green is an arm of the Chippewa Cree Tribe that "enjoy[s] the privilege of tribal immunity"). To give weight to sovereign immunity principles, the statutory term "person" presumptively excludes sovereigns like the Tribes and arms of sovereigns like the Tribal Lenders. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780-81 (2000). No such contrary indications are found

[10] *Dawavendewa* did not additionally analyze whether any existing party to the suit could represent the absent party's interests. Even if this Court does, the Think Entities do not have the same interests as the Tribal Lenders where they do not have the same contractual interests in the loans as the Tribal Lenders do and further where the Think Entities are private parties that cannot adequately represent the Tribes' unique sovereign interests. *See Union Pac. R.R. Co. v. Runyon*, 320 F.R.D. 245, 252-53 (D. Or. 2017).

in the CFPA, which expressly defines "Indian tribe[s]" as co-equals of States as regulators, not as subjects of enforcement. 12 U.S.C. § 5481(27). The Tribal Lenders are therefore immune from suit under the CFPA.[11]

Third, the Tribal Lenders are indispensable parties and this action should therefore be dismissed. Under Rule 19(b), courts look to four factors: "(1) the prejudice . . . to the absent part[ies]; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent part[ies]; and (4) whether there exists an alternative forum." *Dawavendewa*, 276 F.3d at 1161-62. Because this lawsuit would impair the Tribal Lenders' legal interests and prejudice the Tribal Lenders in their ability to select tribal law as the governing law of their contracts, the first two factors are met. *See id.* Adequate relief cannot be awarded without the presence of the Tribal Lenders because the injunctive relief sought would result in prejudice to them and further because an award of damages would not address the Tribal Lenders' contention that they are not "covered persons" under the CFPA. *See id.*; *see supra* n.11. Although no alternative forum is available because the Tribal Lenders are immune

---

[11] The Think Entities note that the Tribal Lenders previously argued to the Ninth Circuit that they were not subject to the Bureau's investigative powers. *CFPB v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017). There the Ninth Circuit held that the CFPB was not "plainly lacking" jurisdiction to issue a civil investigative demand to the Tribal Lenders under the CFPA, but limited its ruling to "this stage of the proceedings" and did not decide whether the CFPB can sue a sovereign Tribe. *Id.* at 1056, 1058-59. The Ninth Circuit found the record there sufficient to conclude the Tribal Lenders were arms of the tribes. *Id*. n. 3.

from suit, the Complaint can and should still be dismissed. *See Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1999) (a Tribe's interest in maintaining its sovereign immunity can outweigh the alternative forum factor).

**IV. The Court lacks personal jurisdiction over Think SPV.**

Plaintiffs bear the burden of establishing that the Court can properly exercise personal jurisdiction over each of the Think Entities. *Allan G. Holms, Inc. v. Mraz*, No. 06-CV-26, 2006 WL 2506044, at *2 (D. Mont. Aug. 28, 2006). The Complaint should be dismissed as to Think SPV because Plaintiffs have failed to meet their burden with respect to it.

Montana's long-arm statute permits the Court to exercise personal jurisdiction over Think SPV "to the maximum extent permitted by federal due process." *Holms*, 2006 WL 2506044, at *2. It contains elements of both general and specific personal jurisdiction. *Id.*

The Supreme Court has set the bar very high on general jurisdiction, deeming it satisfied only where a corporation's "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (internal quotations omitted). Plaintiffs do not allege that Think SPV maintains continuous and systematic contacts with Montana, or any basis for concluding that Think SPV is "essentially at home" there. Nor are there any facts that would show such contacts.

Think SPV is not incorporated in Montana, does not have a principal place of business in Montana, and never has maintained offices or conducted business in Montana. Ex. 4, Wong Decl. ¶¶ 4-7.[12]

To establish specific jurisdiction, the CFPB must show that Think SPV "purposefully direct[ed]" its activities at Montana and that this case "arises out of or relates to . . . [those] activities." *Holms*, 2006 WL 2506044, at *3 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Here, the only activity that the CFPB ascribes to Think SPV is that it "invest[s] and hold[s] shares" in an entity that in turn purchased participation interests in the at-issue loans from the Tribal Lenders. Compl. ¶¶ 15, 72.

Such activities are insufficient to give rise to specific jurisdiction, even if certain of the loans at-issue were entered into by Montana residents. As the Iowa Supreme Court held in finding it lacked jurisdiction under the similar Iowa long arm statute over an investor in participation interests in Iowa loans, it "would not be reasonable for a participant bank to expect to be haled into court in the resident state of each obligor to the underlying installment contract, absent some additional contacts beyond its status as a participant bank." *Ross v. First Savings Bank of Arlington*, 675 N.W.2d 812, 818 (Iowa 2004). The Supreme Court has echoed this

[12] On a motion to dismiss for lack of personal jurisdiction, the Court may consider evidence outside the pleadings, including the Wong declaration. *See Holms*, 2006 WL 2506044, at *2.

ruling, holding that "[t]he proper question [in specific jurisdiction issues] is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014).[13]

Think SPV's does not, and therefore it should be dismissed because the Court lacks personal jurisdiction over it.

**V. The Complaint fails to state cognizable claims under the CFPA.**

Unsurprisingly, one of the results of the Bureau overstepping the bounds of the CFPA is that it has not pled the statutory elements required for its four asserted claims. Dismissal is appropriate on this ground too.

**A. The Complaint improperly lumps together all Think Entities.**

Despite initially alleging that some of the Think Entities were involved in loan servicing activities and some not (Compl. ¶¶ 15-27), the Complaint otherwise lumps all Think Entities together as "Think Finance" in nearly all of its subsequent allegations. This group pleading is improper.

"It well settled that a district court should dismiss a complaint that makes

---

[13] Nor do any of the specific prongs of the Montana long-arm statute apply to Think SPV. It has never transacted any business in Montana, has never entered into any contract for insurance or services in Montana, has never owned any property in Montana, and has never acted as the "director, manager, trustee, or other officer of any [Montana] corporation." Ex. 4, Wong Decl. ¶¶ 4-14; *see* Mont. R. Civ. P. 4(b)(1).

undifferentiated allegations against multiple defendants, because such a complaint fails to put each defendant on notice of the alleged wrongdoing." *Potter v. Dark Horse Comics, Inc.*, No. 16-cv-2090, 2017 WL 2642973, at *2 (D. Or. May 17, 2017) (dismissing complaint). Such is the case here. For example, although the central premise of the Complaint is that the Think Entities engaged in improper conduct with respect to collection and the CFPB alleges broadly that "Think Finance collected on void loans," and drafted template communications regarding upcoming payments due and past-due accounts (Compl. ¶¶ 57, 87-90, 99), the Complaint otherwise alleges that Think Finance, LLC operated through the Subsidiaries, *none of which are alleged to have had any role in collection activities*. *Id.* ¶¶ 14-27. This imprecise pleading fails to put each Defendant on notice of the specific claims against it and conduct in which it is alleged to have participated.

Nor may the CFPB evade this result, or impose joint and several liability on the Think Entities, by alleging their participation in a common enterprise, as such liability does not exist under the CFPA. *See* Compl. ¶¶ 45-49. The text of the statute controls what liability exists under it, and courts should not read into a statute additional forms of liability. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). The text of the CPFA contains no mention of common enterprise liability. Indeed, one court has already rejected

an argument that Think Finance, LLC and several of its same subsidiaries as pled here engaged in a common enterprise under the CFPA, finding such a theory of liability unsupported by the CFPA. *Commonwealth of Pa. v. Think Finance, Inc.*, No. 14-cv-7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016).

**B. Count I fails to state a claim for deceptive conduct.**

The deceptive practices claim fails, first and foremost, because the CFPB has failed to plead with particularity statements that Defendant made that the CFPB alleges were deceptive. Claims for deceptive conduct under the CFPA are required to meet the heightened pleading standards of Rule 9(b). *Prime Mktg. Holdings* , 2016 WL 10516097, at *5-6. Rather than meet these standards, the Complaint contains only two types of insufficient allegations.

First, the CFPB alleges only one circumstances where "Think Finance" itself actually made deceptive statement in collection, when Think Finance allegedly responded to "consumer complaints," quoting from one response written to one MobiLoans borrower. Compl. ¶¶ 99-100. These allegations come nowhere close to meeting the specificity requirements of Rule 9(b). In light of the Bureau's multi-year investigation dating back to 2012, it is a glaring deficiency that the Bureau fails to allege any details regarding any allegedly deceptive consumer-complaint responses directed to Plain Greens or Great Plains borrowers, and only one communication to one MobiLoans borrower. The Complaint therefore does not

"plead with specificity what representations were made, when these representations were made, and to whom they were made." *See Prime Mktg. Holdings*, 2016 WL 10516097, at *7 (dismissing CFPA claim).

Second, the Complaint asserts that "Think Finance" provided various support services to the Tribal Lenders and third-party debt collectors when those entities were themselves engaging in collection activities. Compl. ¶¶ 31-35, 41-42, 53-54, 59-62, 86-93. For example, the CFPB alleges that the Think Entities drafted template letters for the Tribal Lenders, which the Tribal Lenders then modified before the letters were sent to borrowers. *Id.* ¶¶ 87-89.[14] None of this activity, even if true and somehow actionable, is a deceptive act or practice visited upon consumers because it was not directed to the consumers themselves and therefore not likely to materially mislead them. *See CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2291 (2017).

Beyond this, the Bureau makes only an omission claim, alleging that the Think Entities' "fail[ure] to disclose" certain information constituted the deceptive conduct. Compl. ¶¶ 138-39. But the Bureau does not plead the details of the alleged omissions in accordance with Rule 9(b), which it is required to do. *See*

[14] The CFPB additionally alleges that a computer system "created, maintained, and operated" by Think Finance set out letters to borrowers. Compl. ¶¶ 92. However, allegations regarding the output of a computer system developed by the Think Entities but over which the Tribal Lenders had final authority are insufficient to allege conduct by the Think Entities, rather than by the Tribal Lenders. *See Stevens v. Corelogic, Inc.*, 194 F. Supp. 3d 1046, 1052 (S.D. Cal. 2016).

*Wessa v. Watermark Paddlesports, Inc.*, No. C06-5156, 2006 WL 1418906, at *3 (W.D. Wash. May 22, 2006) (omission claim dismissed where it failed to satisfy Rule 9(b) standards). Nor does the Bureau allege why Think Entities—which, by the CFPB's own Complaint was not in direct contact with any consumers (other than certain who had complained)—was *required* to, or even *able* to, make any affirmative statements to any consumers. *See In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052 (9th Cir. 1993) ("[i]n order to prevail on this issue, Plaintiffs must show that Defendants had a legally cognizable duty to disclose").

Second, even if the CFPB had met its requirements under Rule 9(b), its deceptive conduct claim would still fail. Such claims require statements that are "(1) [] likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). The Complaint instead concedes that borrowers were provided with information on applicable law prior to signing their loan agreements and the Complaint never alleges any misrepresentation of fact. *See* Compl. ¶¶ 79-80. It should therefore be dismissed. *See, e.g.*, *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) ("Where a defendant fully discloses the terms and conditions of a transaction, . . . the defendant's conduct is not materially misleading.").

### C. Count II fails to state a claim for unfair conduct.

The Bureau also fails to plead the elements of an "unfair" claim, which the CFPA defines as an act or practice that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" themselves and "not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §§ 5531(c)(1)(A)-(B). The initial shortcoming here is that the borrowers all could have avoided any alleged injuries from the loan products merely by not entering into them.

"In determining whether consumers' injuries were reasonably avoid[ed]," the Ninth Circuit "looks to whether the consumers had a free and informed choice" and "ha[d] reason to anticipate the impending harm and the means to avoid it." *Davis*, 691 F.3d at 1168 (interpreting the meaning of unfair conduct in the California UCL).[15] Here, as noted above, the CFPB does not dispute that the applicable law (tribal law, not state law) and all loan terms were fully-disclosed and agreed-upon by the parties to the loan, the Tribal Lenders and the consumers. Any borrower could have "reasonably avoided" the harm alleged by the CFPB merely by not accepting the loan terms. *See FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 951 (N.D. Ill. 2008) (dismissing unfairness claim where the alleged injuries to consumers "could have been reasonably avoided merely by not signing

[15] *See also CFPB v. D & D Mktg.*, No. 15-cv-9692, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016) (extending *Davis*'s holding to the CFPA).

on with [the company at issue]"). Absent allegations that the borrowers were not contracting on disclosed, agreed-upon terms, the Complaint simply does not allege a claim of unfairness.

Moreover, despite it being the CFPB's burden to allege that any injuries were "not outweighed by countervailing benefits to consumers or to competition," 12 U.S.C. § 5531(c)(1)(B), the CFPB's sole allegations to meet this element of the unfairness test do not quantify the amount of any benefits or even identify which benefits the products have for borrowers, *see* Compl. ¶¶ 146-48. The Complaint should therefore be dismissed because "[n]othing in [it] allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits." *CFPB v. Intercept Corp.*, No. 16-cv-144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) (dismissing CFPB complaint). This failure makes the CFPB's claims all the more implausible where there is no dispute that the loan products at issue provided substantial benefits. *Supra* pp. 5-6; *see CFPB v. Cashcall, Inc.*, No. 15-07522, 2014 WL 485963, at *13 (C.D. Cal. Jan. 19, 2018) (acknowledging that borrowers received a benefit from the type of small-dollar loan products at issue there).

**D. Count III fails to state a claim for abusive conduct.**

Count III is similarly deficient as to stating a claim for abusive conduct, which requires an act to "materially interfere[] with the ability of a consumer to

understand a term or condition of a consumer financial product or service; or . . . take[] unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d). Again, as discussed above, the CFPB does not (and, the Think Entities believe, cannot) allege that the Tribal Lenders, let alone the Think Entities, failed to disclose any material terms of the loans to the subject borrowers or did anything to interfere with borrowers' understanding of the relevant terms. This is not enough. *See Intercept Corp.*, 2017 WL 3774379, at *4 (dismissing abusive conduct claim for lack of sufficient factual detail).

**E. Count IV fails to state a substantial assistance claim.**

The Complaint's wholly-derivative claim in Count IV, that "Think Finance provided substantial assistance to the Tribal [L]enders" and collection service providers in their "demand[s] [for] payment for and collecting debts that were void or that consumers were not required to repay," must be dismissed for the same reasons that the identical allegations against the Think Entities fail to state a claim for relief under the CFPA. Compl. ¶¶ 158-61. Indeed, the CFPB's improper group pleading obfuscates that some of the Think Entities provided no assistance at all to the Tribal Lenders by the CFPB's own admission. *See id.* ¶¶ 15, 19.

Count IV should also be partially dismissed as to the claim that the Think Entities provided substantial assistance to the Tribal Lenders for the additional

reason that it is not plausible. "[S]ubstantial assistance" claims require one to provide support to a "covered person", 12 U.S.C. § 5536(a)(3), but the Complaint never claims that the Tribal Lenders fall under this definition. If the CFPB's theory is that the Tribal Lenders somehow qualify as "persons" or "covered persons" under the CFPA, it must state so in its Complaint and explain a plausible basis for the assertion. The CFPB's failure to do so requires dismissal of this portion of their claim. *See Intercept Corp.*, 2017 WL 3774379, at *3-4 (dismissing substantial assistance claim for failure to show an underlying violation). This is particularly true given that Indian Tribes likely cannot even be "covered persons" under the CFPA. *See supra* pp. 20-21.

## VI. The statute of limitations bars claims against the Subsidiaries related to conduct arising prior to March 28, 2015.

Finally, claims against the Subsidiaries are time-barred to the extent they concern conduct arising prior to March 28, 2015. Under the CFPA, the CFPB may not bring an action for conduct that occurred "more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g). The CFPB began investigating potential violations of the CFPA by Think Finance, LLC, and therefore by the operating Subsidiaries, no later than June 12, 2012, and was therefore on notice of potential violations by then or shortly afterwards during

its investigation. Exs. 5-6.[16] Although the CFPB entered into tolling agreements to preserve their claims against Think Finance, LLC, those agreements preserve only claims against that specific entity and not also claims against the Subsidiaries. *Id.* (defining the parties to be only the Bureau and Think Finance, Inc., the predecessor to Think Finance, LLC). The Court should therefore dismiss claims against the Subsidiaries based on conduct arising prior to March 28, 2015.

## CONCLUSION

For these reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

Dated: April 24, 2018

By: */s/ Thomas M. Hefferon*

THOMAS M. HEFFERON (*pro hac vice*)
MATTHEW S. SHELDON (*pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Avenue NW
Washington, DC 20001
Tel.: 202-346-4000
Fax.: 202-346-4444
*thefferon@goodwinlaw.com*
*srosesmith@goodwinlaw.com*
*msheldon@goodwinlaw.com*

DAVID ROSENBERG (*pro hac vice*)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617-570-1000
Fax.: 617-523-1231
*drosenberg@goodwinlaw.com*

[16] The CFPB similarly began investigating the Tribal Lenders in connection with their part in any violations of the CFPA at least by that same date. *See* Mem. in Support of Pet. to Enforce Civil Investigative Demands at 3, *CFPB v. Great Plains Lending, LLC*, No. 14-cv-02090 (C.D. Cal. Mar. 19, 2014).

*/s/ Leo S. Ward (with permission)*
LEO S. WARD
**BROWNING KALECZYC BERRY & HOVEN P.C.**
800 N. Last Chance Gulch, Suite 101
Helena, MT 59601
Tel.: (406) 443-6820
leow@bkbh.com

Attorneys for Defendants:
THINK FINANCE, LLC; THINK FINANCE SPV, LLC; FINANCIAL U, LLC; TC LOAN SERVICE, LLC; TAILWIND MARKETING, LLC; TC ADMINISTRATIVE SERVICES, LLC; and TC DECISION SERVICES, LLC

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(d)(2)(E), I certify that Think Entities' Memorandum in Support of Its Motion to Dismiss is double spaced, is a proportionately spaced 14-point typeface, and contains 7,993 words, excluding the caption, signature block, certificates of service and compliance, and tables of contents and authorities.

**CERTIFICATE OF SERVICE**

I, Thomas M. Hefferon, certify that on this 24th day of April, 2018, I served the foregoing document on all counsel of record via the Court's CM/ECF system. The document is available for viewing and downloading from the ECF system.

*/s/ Thomas M. Hefferon*
Thomas M. Hefferon